LILLIAN MALLINGER, Appellant, v. WEBSTER CITY OIL COMPANY et al., Appellees.

No. 39903.

848

DECEMBER 13, 1929.

OPINION ON REHEARING JANUARY 20, 1931.

*V. L. Sharp, C. J. Rosenberger,* and *F. F. Messer,* for appellant.

*H. B. White* and *Havner, Flick, Huebner & Powers,* for appellees.

DE GRAFF, J.—This is a workmen's compensation case. The finding of the deputy industrial commissioner contains this language:

"Upon the record, it is held that W. B. Mallinger was engaged in the capacity of an independent contractor on December

8, 1926, the date of his fatal injury, and was not at that time an employee of the Webster City Oil Company, within the meaning of the Compensation Law."

In the decision on review, filed by the industrial commissioner, who affirmed the aforesaid ruling, this language is found:

"December 8, 1926, W. B. Mallinger, husband of this claimant, lost his life at a railway crossing. The question involved herein is as to whether or not this death arose out of employment by the Webster City Oil Company."

The commissioner answered in the negative, and held that Mallinger was an independent contractor.

The instant appeal is from the judgment entered by the district court of Iowa in and for Webster County, wherein the ruling of the industrial commissioner was affirmed. Is there  evidence in the record from which the commissioner could find that deceased was an independent contractor? This cause in this court is not triable *de novo*. In the last analysis, the question presented is one of law, to be determined in the light of the signed contract between Mallinger, the deceased, and the Webster City Oil Company, together with other competent evidence offered and introduced before the industrial commissioner, which was transcribed on appeal to the district court.

It is difficult at times to differentiate between findings of fact and findings or conclusions of law. Probably no better rule can be devised than that announced in *Village of Weyauwega v. Industrial Commission*, 180 Wis. 168 (192 N.W. 452):

"Whether a finding is an ultimate fact or conclusion of law depends upon whether it is reached by natural reasoning or by the application of fixed rules of law."

In other words, where the ultimate conclusion can be arrived at only by applying a rule of law, the result so reached embodies a conclusion of law, and is not a finding of fact. Under the instant record, we will make answer to the decisive question involved, to wit: Was Mallinger an employee, within the meaning of the Iowa Compensation Law, or was he an independent contractor, under the rule and tests of the common law? If

Mallinger was an employee, within the definition of the Compensation Act (Section 1421, Par. 2, Code, 1924), then the claimant (his widow) is entitled to the relief prayed. If, on the other hand, Mallinger was an independent contractor, the claimant (his widow) is not entitled to relief, and for the reason that the Compensation Act specifically excludes an independent contractor from the relief otherwise granted by the act. (Section 1421, Par. 3 (c), Code, 1924.)

An "employee," under the Compensation Act, "means a person who has entered into the employment of, or works under contract of service, express or implied, * * * for an employer * * *." Section 1421, supra. It will be ob-served that the employment or work must be under a contract *of* service, "and when so, this brings the employee within the purview of the remedy provided; and that the relation of contract *for* service is excluded from the terms of the act." *Pace v. Appanoose County,* 184 Iowa 498, l. c. 508. To avoid the defeating of the terms of the Compensation Act, the general assembly enacted:

"No contract, rule, regulation, or device whatsoever shall operate to relieve the employer, in whole or in part, from any liability created by this chapter, except as herein provided." Section 1378, Code, 1924.

At the outset, it may further be observed that the general assembly of Iowa, in the enactment of Section 1421, Par. 3 (c), did not define the term "independent contractor," used in said act. However, this court has held that the term "independent contractor" does, despite the liberal interpretations of the act, retain its common-law meaning, and is still to be given the meaning that courts have always given the term. *Norton v. Day Coal Co.,* 192 Iowa 160. This means that the tests of the common law are applicable, and none other.

Before passing to the analysis of the written contract in question, it may be well to examine and analyze the usual legal tests that are adopted by courts in determining whether or not a person classifies as an independent contractor, under the facts

and circumstances of a given case. The term has a fairly well defined meaning under the decisions of many jurisdictions, including our own. An independent contractor, under the quite universal rule, may be defined as one who carries on an independent business, and contracts to do a piece of work according to his own methods, subject to the employer's control only as to results. The commonly recognized tests of such a relationship are, although not necessarily concurrent, or each in itself controlling: (1) the existence of a contract for the performance by a person of a certain piece or kind of work at a fixed price; (2) independent nature of his business or of his distinct calling; (3) his employment of assistants, with the right to supervise their activities; (4) his obligation to furnish necessary tools, supplies, and materials; (5) his right to control the progress of the work, except as to final results; (6) the time for which the workman is employed; (7) the method of payment, whether by time or by job; (8) whether the work is part of the regular business of the employer. If the workman is using the tools or equipment of the employer, it is understood and generally held that the one using them, especially if they are of substantial value, is a servant.

In *In re Estate of Amond*, 203 Iowa 306, the Workmen's Compensation Law was involved, and the question was whether the decedent, who was a teamster, was an employee or an independent contractor at the time he received the injury resulting in his death. The opinion presents an exhaustive discussion of the distinction between an employee and an independent contractor, and cites and reviews many decisions bearing on the proposition involved. The court concluded that the deceased teamster was an independent contractor. This court, in the foregoing decision, speaking through Stevens, J., said:

"Does the employee represent the master as to the result of the work only, or as to the means by which the result is obtained? If as to the result, and in the employment of the means he acts entirely independently of the master, he must be regarded as an independent contractor."

In the instant case, the evidence indisputably shows that the employer not only directed the means, but furnished the means to Mallinger to carry out his contractual obligation; that

Mallinger had no business or occupation other than that prescribed in his contract, and did in fact devote his entire time and energy to the Webster City Oil Company, and did not act independently of the oil company's business in any way.

We will now analyze the provisions contained in the contract in question between Mallinger and the Webster City Oil Company. The evidence offered, over proper objections, by the Oil Company *de hors* the contract is matter of legal conclusion only, and does not impeach the fair import and meaning of the written contract.

The contract was entered into on August 1, 1925. Mallinger was to be paid a fixed commission by the oil company for his services in the sale and distribution of the oil company's products, to wit: gasoline, kerosene, distillate, oil, grease, and denatured alcohol in certain described territory in the vicinity of Webster City, Iowa. The oil company agreed to furnish the tank truck, measuring buckets, funnels, etc., necessary to the handling of the above-named commodities. The oil company was to keep the truck in proper repair, and such repairs "must be made in the company's shop, unless otherwise authorized." The oil company agreed to furnish gasoline, oil, and grease for the use of the tank truck while Mallinger was selling and distributing the above-named products. The contract stipulated the commission for retail cash sales at so much for gasoline and kerosene and so much for distillate, but the prescribed commission did not apply to distillate in the city of Webster City, "as other arrangements will be necessary, on account of a contract price;" but it was necessary for the parties to agree thereon at "a special time after the contract has been let." The contract also provided for commission for retail cash sales as to oils, denatured alcohol, and on all greases. It also provided for commission for wholesale sales as to all of the commodities covered by the contract. The contract provided as to the time of payment of commissions. Mallinger was to furnish a surety bond to guarantee his dealings with the oil company and the public, "and to perform his duties as is provided for in the contract and agreement." Under this contract Mallinger was to secure credit ratings from the oil company of all purchasers before the sale of products "will be accepted," and in the event that he made sales without first obtaining credit rating from

the company, Mallinger guaranteed the account on a 50-50 basis: that is, if the company should be unable to collect the amount, "then each party is to stand 50 per cent of the amount involved." The contract also provided that charge tickets furnished by the company were to be signed by the purchaser, and were to be correctly filled out by Mallinger and plainly written, and the original copy should go to the office of the company, the duplicate retained in the record book kept by Mallinger, and the triplicate given to the customer. The contract also provided that no gasoline should be placed in any container of any description that was not *painted red*. The contract also obligated Mallinger to keep the truck well oiled and greased, and to keep it clean, and to use reasonable care "not to drive too fast." The tires of the truck were to be kept properly inflated and the radiator filled with water. The oil company was to furnish wash rack, hose, sponge, and water, whenever necessary to wash the truck, which Mallinger was at all times obligated to keep in good appearance. The contract provided that any damage to the truck, accruing from any source whatever, while in the charge of Mallinger, was to be paid on a 50-50 basis: "that is, repairs and labor to replace the damages, each party to pay one half of the total cost." It is also provided that either party was entitled to a ten days' written notice, in order to cancel the contract and be released from further contractual obligations, with the exception that the bond furnished by Mallinger should remain in force until the oil company "is fully satisfied that the terms of this contract and agreement have been fully complied with by the party of the second part [Mallinger]."

It is apparent that the relationship established by the contract involved a question of construction,—that is, a matter of law. This must be true, as the evidence relating to the method  of doing business is without conflict, nor is the contract susceptible of conflicting inferences. Section 1452, Code, 1924, provides that, in the absence of fraud, the findings of fact made by the industrial commissioner within his powers shall be conclusive. See *Rish v. Iowa Portland Cement Co.*, 186 Iowa 443, l. c. 453, wherein it is said:

"The finding of the commissioner upon questions of fact

is made conclusive and binding upon the court by the statute; but, if the facts found do not support the order, or if there is not sufficient competent evidence in the record to warrant the industrial commissioner in making same, such order may be set aside by the court.''

This statutory provision has been invoked and applied in many cases that have come before this court, and we have consistently held that, when the evidence presents a conflict, the findings of fact by the commissioner will not be disturbed. However, nowhere in the Compensation Act is it provided that the commissioner's conclusions of law are conclusive upon the court. See *Hunter v. Colfax Cons. Coal Co.*, 175 Iowa 245, l. c. 315. If the findings of the commissioner on facts and conclusions of law were both placed within his jurisdiction, and his conclusions of law are to be viewed as conclusive, then, for all purposes, there would be an ouster of judicial power now vested in the courts.

The instant appeal, as has been pointed out, is from the judgment of the trial court in this matter. The record which the industrial commissioner is required to file in the office of the clerk of the district court on appeal consists of a full and complete transcript of all documents in the case, including depositions and a transcript of the evidence, if reported, together with the notice of appeal. Section 1450, Code, 1924. It is this record which comes to this court upon which our decision must be based. Where there is no conflict in the evidence, there is no necessity for a finding of fact. Where there is a conflict, then the commissioner is to make his findings of fact. Apt language is used by the Supreme Court of Wisconsin in *Tesch v. Industrial Commission*, 200 Wis. 616 (229 N. W. 194), wherein Chief Justice Rosenberry, speaking for the court, said:

''When the facts are found, a question of law is presented. The application of the law to the facts results in a decision which determines questions of liability. The requirement of the statute that the commission find the facts and state them fully was no doubt inserted for the very purpose of presenting questions of law and enabling such questions to be reviewed.''

In the findings in the case at bar, the commissioner stated, in his decision on review, that Mallinger, for more than a year

prior to his death, had been selling and delivering merchandise from the Webster City Oil Company under the provisions of the contract and agreement (Exhibit M). There is no conflict about this matter. The commissioner further found that, on the date of Mallinger's death, he was collecting bills for the Webster City Oil Company, covering sales and deliveries he had made within his prescribed territory. This is not disputed. Under the terms of this contract, Mallinger was to be furnished with all the equipment by the Webster City Oil Company. This equipment was so furnished, and there is no dispute in the evidence about this. Mallinger was authorized to call for the products named in the contract at any time and in any quantity to suit his contractual purpose. The contract in question prescribes the manner in which Mallinger should secure orders and make deliveries. There is no conflict here. The Webster City Oil Company owned and licensed the tank truck, and owned all of the commodities furnished to Mallinger for sale and distribution. The title to these products was in the oil company at all times, and until the products were sold by Mallinger to customers; and then the title to the money received, when received, belonged to the oil company. The company prepared and furnished to Mallinger the credit slips to be used by him. These tickets conclusively show that the goods came from the Webster City Oil Company, and no tickets would be accepted by the company unless properly made out by Mallinger and signed by the purchaser. If payment for the goods delivered was received at the time by Mallinger, he was ordered to "sign here" on the sales slip, as driver. If the goods were to be charged, Mallinger must, as driver, "sign here." When Mallinger turned the sales tickets over to the company, he turned over the money he had received on cash sales, and if on a credit sale, an entry was made on the company's records, debiting the purchaser, not Mallinger. The company, when necessary, sent out bills to these debtors for the goods purchased, and did so even after the death of Mallinger. The record shows that, on December 8, 1926, the date of the death of Mallinger, he gave a receipt for $43.88 due the company, which receipt was signed "W. C. Oil Co., W. B. M." The record evidence is ample to prove that, when Mallinger was selling, delivering, and collecting, he was acting for the oil company and under its authority.

Checks in payment of such accounts were made payable to the company.

Mallinger was allowed latitude in his physical movements and in the exercise of his judgment in covering the territory assigned him under the contract. This perforce was necessary, and was contemplated by the contract. It is necessarily implied that, had Mallinger not given sufficient attention to his work to accomplish the purpose of his employment by the company, he would have lost his employment. Mallinger was not engaged in a distinct occupation or business. He was not independently in the oil business. He was a part of the sales organization of the oil company, and was employed by said company to prosecute the business of the company, as per terms of his contract with said company. "He didn't do anything else." He was subject to the orders of the company, although it may be said that, under the contract, there was little or no occasion for the company to give him directions, certainly not as to the territory which had been defined, or as to what time he should devote to the business. The secretary-treasurer of the oil company testified that Mallinger was free to put in whatever time he saw fit. This official testified that he didn't think that he ever gave Mallinger an order or direction to deliver a truck load of gasoline, "but there are others in charge of that. Some of the other men might have issued orders. * * * Q. When he [Mallinger] loaded his truck at your place of business and delivered it, he was delivering your oil, was he not? A. Yes, I suppose. * * * Q. But he collected the accounts and remitted to your company? A. Yes."

It may also be pointed out that the company took it upon itself to direct Mallinger to attend meetings, and he was called to the headquarters of this corporation for special meetings, sales meetings, "get together meetings," and sales talks. Mallinger was employed for the reason that the company decided that he had the ability to make sales, deliver the goods, and collect the pay therefor.

It may also be pointed out that the contract ordered and compelled Mallinger to use red-painted containers in the delivery of gasoline, and it may be further stated that, if Mallinger had been an independent contractor in this business, he would have been compelled, under the state law, to secure a license

to sell and deliver gasoline. It is conclusively shown that Mallinger procured no license, but the company did.

In brief, Mallinger was not engaged in the oil and gas business on his own account. His business was not separate and independent of the employing oil company, but a part of *its* business. He had no sales organization, which would indicate that he was engaged in an independent business as a seller and deliverer of the products of the oil company. He employed no assistants.

Mallinger's contract had no date of expiration. It was a continuing employment, dependent upon whether either of the parties wished to cancel, on ten days' notice. A master cannot, by limiting the servant's control to a certain degree of the methods and means by which results are to be accomplished, thereby place his servant in the status of an independent contractor. The person employed to perform the acts contemplated by the employment must be either a servant or an independent contractor. He cannot be both at the same time. This was the theory upon which this case was tried below. In the absence of any express waiver of rights, it is presumed that the rights were reserved. It does not matter whether the rights were exercised. In the case of *Franks v. Carpenter*, 192 Iowa 1398, one of the determinative questions was whether Bert Franks, at the time of his death, was the employee of Carpenter or of an independent contractor, Hudson. In the opinion it is said:

"There is no absolute rule for determining whether, under a given state of facts, the one doing or having charge of the work is an independent contractor or an employee." Quoting further from the opinion it is said: "Nothing was said between Carpenter and Hudson as to the manner of doing the work, nor is there anything in the contract or arrangement between them, or in the manner in which it was carried out, to indicate that Carpenter in any respect waived his right to control or direct the time or manner of making the excavation and laying the drain. There was no occasion for any specific reservation of this right. * * * The fact that he refrained from doing so [discharging Hudson, Franks, or any other employee] is not of controlling importance."

It is then pointed out that the appellant Carpenter places

significance on the fact that Hudson (the foreman) and the men employed with him determined how the work should be done, the number of hours employed, etc., and in this connection it is said:

."There was nothing in the contract between Hudson and Carpenter to prevent the latter from fixing the time for the men to commence work and the number of hours they should work each day. He [Carpenter] simply refrained from doing so, and left it all to the discretion of Hudson. This did not make him an independent contractor."

The court held that Carpenter was an employer, within the purview of the Compensation Act. See, also, *Smith v. Marshall Ice Co.*, 204 Iowa 1348; *Root v. Shadbolt & Middleton*, 195 Iowa 1225.

The fact that Mallinger received a stated commission in lieu of wages is not in any sense controlling. If he had received a stated wage or salary, it would have made no difference in his status, under the instant contract. The fact that the contract did not require Mallinger to punch a time clock or account otherwise for the time he spent in selling and delivering the oil company's products makes no difference in his relationship to the company. The oil company, by making the contract in question with Mallinger, deemed it unnecessary to recite the details of his work; but the absence of such matters in the contract does not result in the waiver by the employer of the power to direct and control the things not expressly recited. Mallinger's contract provided that he should make sales and deliveries of the products handled by the company, and, as pointed out, he was furnished with the equipment to handle the products, and was given much freedom in the methods and means whereby he was to do his work. He could sell the goods for cash or on credit. Nowhere in the contract is it stated what price Mallinger or anybody else was to pay for the goods, but it can be conclusively presumed that the company fixed the prices at various times, and instructed Mallinger to charge such prices on the goods sold by him. Mallinger was expressly recognized as "driver." In brief, the contract of service involved mainly the selling and distributing of the products of the oil company. It is beyond question, as disclosed by the record evidence, that Mallinger was

given directions as to the methods and means whereby he was to make sales, deliver the goods, collect the pay, care for the truck, transport the gasoline, etc. If Mallinger had been an independent contractor, it would have been incumbent upon him to procure the necessary license. If Mallinger had disobeyed the law as to the delivery of gasoline, and damage had resulted through his negligence, by explosion or otherwise, would the oil company have been liable? The answer is "no," if the theory of the oil company is true; otherwise, "yes." The gasoline belonged to the oil company, not only while in its yards, but when Mallinger filled the tank truck belonging to the oil company, and as long as the gasoline remained unsold by Mallinger.

The facts in this case are undisputed, and when the facts are found, then a question of law alone is presented. We conclude that the relationship existing between Mallinger and the oil company was that of employer and employee, within the meaning of the Workmen's Compensation Law.

The judgment entered by the trial court is reversed, with directions that the industrial commissioner enter an order finding that the decedent W. B. Mallinger was, at the time of his fatal injury, on December 8, 1926, an employee of the Webster City Oil Company, and that said commissioner proceed to determine the amount of compensation that may be due the plaintiff-appellant Lillian Mallinger, as surviving spouse, under the provisions of the Workmen's Compensation Law.

With directions, as herein stated, the cause is—*Reversed.*

FAVILLE, C. J., and STEVENS, ALBERT, MORLING, KINDIG, and WAGNER, JJ., concur.

EVANS and GRIMM, JJ., dissent.