BAER, Respondent, v. ARMOUR & COMPANY, Appellant.

(258 N. W. 135.)

(File No. 7726. Opinion filed December 29, 1934.)

*Williamson, Smith & Williamson,* of Aberdeen, for Appellant.
*Morrison & Skaug,* of Mobridge, for Respondent.

WARREN, J. The plaintiff, as administratrix, brought action to recover for the alleged wrongful death of her husband, Max O. Baer, who died as the result of a collision between the car he was driving and a truck driven by E. F. Colby and owned by said Colby and one Verne Hull. The collision occurred at a point about six miles north of Hoven, in Walworth county, S. D. Baer was severely injured and died a short time thereafter.

Plaintiff contended upon trial of said action that Colby was engaged in trucking, hauling cream and empty cans, over a route mapped out by the defendant Armour & Co. That such a route was laid out and furnished by Armour & Co. to said Colby is denied by the defendants, who contend that Colby and Hull were independent contractors having contracted in writing for hauling with one G. A. Stoddard. Plaintiff further contended that the contracts did not cover the relationship of independent contractors because they did not cover a fixed and definite job, but that the work to be done was wholly determinable by Armour & Co.; that there was no definite beginning, continuance, and ending which is the test of relationship between employer and employee, and, further, that Colby was an employee taking his orders direct from Armour & Co.

The trial resulted in a verdict and judgment for plaintiff against all of the defendants. Motion for new trial was made, and it was denied. Appellant Armour & Co. alone has appealed.

Some nineteen assignments of error are urged by the appellant. There is the motion for directed verdict and the denial of the motion for judgment notwithstanding the verdict, both of which are based upon the claim that the truck operator was an independent contractor. A large amount of brief space has been devoted to the presenting of that contention, and also to the alleged failure of the evidence to show that the truck driver was not a servant of the defendant Armour & Co.

It is apparent from the briefs and oral argument that the real question before us and which merits our consideration is: Was the truck driver a servant or agent of the appellant, or was he an independent contractor for whose negligence appellant is not responsible? The contracts and the conduct of the parties require considerable attention. It appears to us that the test of the relationship in this case must be determined by the contracts and the right of supervision and control exerted by the appellant, Armour & Co., over Colby. We turn to the authorities for enlightenment as to the relationship existing between the parties. The results of the examination of the authorities for the purpose of determining the relationship existing between the appellant, Armour & Co., and the defendants Stoddard, Colby, and Hull are most unsatisfactory. The large number of authorities pertaining to cases dealing with facts almost identical to the ones before us are about equally divided on the question. Some courts have attempted the task of reconciling and marshaling the authorities relating to master and servant and to independent contractors. They found, however, at the outset how utterly hopeless it was, and expressed their disappointment by stating that the result was so confusing that each case must be determined from the particular facts in the case before the court. The Supreme Court of Nebraska in Showers v. Lund, 123 Neb. 56, 242 N. W. 258, 260, in its attempt to make the distinction between an employee and an independent contractor, expressed the result of its investigation of authorities as follows: "Much learning has been written into the decisions of the courts on the distinctions between an employee and an independent contractor. The result is confusing. It is difficult to reconcile the diverse results derived from quite similar facts. Some apparent inconsistencies are traceable to local statutes. In writing of the diversity and confusion of opinion in the precedents in different jurisdictions, the Iowa Supreme Court said: 'In this state of the precedents we can only hope to maintain, if we may, consistency in our own decisions.' Burns v. Eno, 213 Iowa 881, 240 N. W. 209, 210."

The Iowa court prefaced the quotation used in Showers v. Lund, supra, by saying: "The question raised is one which lends itself to endless debate and rather plausible argument on either side. Discussion of the question abounds in the books. Harmony

is apparent in the statement of principles and in the platitudes and abstract phases of the subject. But in the application of the abstract to the concrete, and of the principles to the particular case in hand *there is much diversity and confusion of opinion in the precedents in different jurisdictions."* (Italics ours.)

The opinion then distinguishes between the duties of servants and independent contractors and discusses the general principles relating to test marks as follows: "The general principles underlying the distinctions between an employee and an independent contractor are stated in the Mallinger Case [211 Iowa 847, 234 N. W. 254], and we can do no better at this point than to quote them: 'Before passing to the analysis of the written contract in question, it may be well to examine and analyze the usual legal tests that are adopted by courts in determining whether or not a person classifies as an independent contractor under the facts and circumstances of a given case. The term has a fairly well-defined meaning under the decisions of many jurisdictions, including our own. An independent contractor under the quite universal rule may be defined as one who carries on an independent business and contracts to do a piece of work according to his own methods, subject to the employer's control only as to results. The commonly recognized tests of such a relationship are, although not necessarily concurrent or each in itself controlling: (1) The existence of a contract for the performance by a person of a certain piece or kind of work at a fixed price; (2) independent nature of his business or of his distinct calling; (3) his employment of assistants with the right to supervise their activities; (4) his obligation to furnish necessary tools, supplies, and materials; (5) his right to control the progress of the work, except as to final results; (6) the time for which the workman is employed; (7) the method of payment, whether by time or by job; (8) whether the work is part of the regular business of the employer. If the workman is using the tools or equipment of the employer, it is understood and generally held that the one using them especially if of substantial values, is a servant."

█ Applying the principles and the well-defined meaning under the different decisions of the several jurisdictions and as above harmonized, it would seem that by independent contractors are meant those who carry on an independent business and con-

tract to do work according to their own methods, subject to employer's control only as to results. That such was the intention in the instant case seems reasonable to assume from the contents of the contract entered into by and between Armour & Co. and Stoddard, which is as follows:

"Trucking Contract.

"This agreement made and entered into by and between G. A. Stoddard, Mitchell, S. Dak., First Party, and Armour & Company, a corporation, Second Party, witnesseth that:

"Whereas, first party is engaged in the business of furnishing automotive transportation and second party desires to procure the services of first party for the purpose of transporting the merchandise of itself and its subsidiary and affiliated companies, as hereinafter set forth:

"Now, therefore, the second party agrees that it will deliver to first party for transportation all meats and food products it has available for delivery by automotive truck in the territory described in Schedule 'A' hereto attached and made a part hereof, and first party, in consideration thereof and for the compensation hereinafter provided to be paid to him, agrees to receive from second party and from its subsidiary and affiliated companies, and to transport promptly and safely by automotive truck, all in accordance with said Schedule 'A' upon the terms and conditions set forth below, the meats, food products and merchandise delivered to him for transportation by second party and by any of its subsidiary and affiliated companies.

"Terms and Conditions.

"(1) General Provisions.

"(a) All goods handled by first party for second party, and for any of second party's subsidiary and affiliated companies, during the life of this agreement, shall be covered by the terms and conditions of this contract without any special designation that they are to be so covered, and it is understood and agreed that in each instance where the word 'shipper' is hereinafter used in this contract it shall be construed, in connection with each piece of goods transported, to mean the second party, or any of its subsidiary and affiliated companies, as the case may be, depending upon which is the actual shipper of the goods.

"(b) The terms and conditions of this contract shall not be modified or waived by any provisions or stipulations in any receipt, bill of lading or other instrument.

"(c) This contract cancels and supplants any and all other agreements and understandings between first party on the one hand and second party and its subsidiary and affiliated companies on the other hand and shall remain in full force and effect from June 1, 1933, until cancelled by either party upon fifteen days prior written notice.

"(d) First party shall employ all persons operating trucks hereunder and such persons shall be and remain the employees of first party and not the employees of the second party, it being the intention of the parties hereto that first party shall be and remain an independent contractor and that nothing herein contained shall be construed inconsistent with that status. First party promises and agrees not to display the name of second party or any of its subsidiary or affiliated companies upon or about any of first party's vehicles.

"(2) Deliveries, etc.

"First party shall promptly call for the goods to be transported hereunder and shall safely and without delay transport and deliver the same to the person or persons named by the shipper at the destination or destinations designated by the shipper.

"(3) Receipts.

"First party shall take signed receipts, upon forms satisfactory to the shipper, from all persons to whom deliveries shall be made, said receipts to be taken in duplicate showing in detail the goods delivered, and first party shall promptly deliver one copy of all such receipts to the shipper.

"(4) C. O. D. Shipments.

"First party shall collect for all C. O. D. shipments before making delivery, said collections to be in cash unless otherwise specifically authorized by the shipper, and, in the event of first party violating this provision, first party shall be directly responsible to the shipper for the price of the goods to the consumer without the shipper being required to first exhaust its remedies against the person or persons receiving the C. O. D. shipments.

"(5) Remittances.

"All collections made by the first party for the account of the shipper shall be by first party immediately remitted to the shipper, either by the delivery of currency in person, or by bank drafts, express or post office money orders, payable to the order of the shipper, and delivered in person or mailed to the shipper at such point as the shipper may from time to time designate.

"(6) Care and Custody of Merchandise.

"First party shall be responsible to the shipper for all loss or damage, of whatsoever kind and nature and howsoever caused, to any and all goods entrusted to first party hereunder, occurring while same remains in the care, custody or control of first party, or any other person to whom the first party may have entrusted said goods, and before said goods are delivered as herein provided or returned to the shipper.

"(7) Insurance.

"First party hereby authorizes second party to procure and keep in full force and effect during the life of this contract, for the second party's protection, public liability and property damage insurance on all of first party's vehicles used by first party and first party's agents and employees in transporting goods under this contract, (said insurance to be carried in a reliable stock insurance company and to insure second party and its subsidiary and affiliated companies against liability for personal injury or death at not less than $25,000.00 for one person and $50,000.00 for more than one person in any one accident, and against liability for property damage at not less than $1,000.00 for any one accident) and to procure for second party's protection insurance against loss of, or damage to goods, and losses under paragraphs (4) and (5) hereof; all such insurance to be without recourse against first party except as to losses caused by the dishonesty of first party or his employes, or in violation of paragraphs (4) and/or (5) hereof. First party agrees to stand the expense of such insurance to the extent of one and one half per cent of the compensation earned under this contract, and second party and/or its subsidiary and affiliated companies are hereby authorized to deduct such amounts in remitting to first party. If for any reason second party is unable to procure such insurance, or continue the same in force, it

shall have the right to cancel and terminate this contract upon ten days written notice.

"(8) Assignments.

"Any assignment of this contract by first party without the written consent of second party having first been obtained shall be void and of no effect.

"(9) Compensation.

"The second party shall pay, or cause to be paid, to the first party weekly the charges shown on the attached Schedule '—' hereby made a part hereof, which shall cover first party's entire compensation for handling, transporting, delivering, distributing, and caring for said merchandise, and for all other services to be performed by first party including the making of collections and remittances.

"Executed in duplicate this 23 day of May, 1933.

"G. A. Stoddard, First Party.
"Armour & Company
　　　"By G. D. Scott, Second Party."

On the reverse side of the exhibit there is a schedule of certain towns and also the charges to be paid per can from each town.

The record discloses the fact that, after the execution of the above contract, Stoddard entered into a similar contract with Colby and Hull for the hauling of the same said commodities over the same route. It may well be said that there is nothing within said contracts creating the relationship of master and servant. In fact the language in both said instruments is to the contrary and is specific in its terms to the effect that no such relationship shall exist, but that the relationship of the contractor shall be that of an independent contractor.

It is contended that certain directions as to performance are contained within the written contracts, and that there is some evidence that the contractor was told to bring in the cream earlier so that it would not sour too much, and that the contractee suggested certain changes in the route. The giving of such directions is not of such a nature as could change the relationship of independent contractor to that of master and servant. The directions in the contract and the directions given to bring in the cream were merely the contractee's control only as to results.

If the master and servant rule is applicable in this case, there must be more than a mere control as to results in order to bring the facts under the statutory definition of master and servant, as provided by section 1100 of the 1919 South Dakota Revised Code, which is as follows: "A servant is one who is employed to render personal service to his employer, otherwise than in the pursuit of an independent calling, and who in such service remains entirely under the control and direction of the latter, who is called his master."

It will be observed that there is a sharp distinction between *an independent calling* and the services rendered by servants, in *that the services of a servant remain entirely under the control and direction of the employer who is called his master*. Such a situation as to direction and control as required in said section does not appear from the record before us. The contracts between the parties are expressly to the contrary, and the evidence relied upon by the respondent cannot be said to bring the facts within the master and servant rule, but rather bring them within the rule of the pursuit of an independent calling. The Supreme Court of Wisconsin in the recent decision of School Dist. No. 1, Town of Hiles et al. v. Industrial Commission, 257 N. W. 18, 19, recognizes the fact that the terms and conditions of the contract between the parties are of considerable importance in determining the relationship between the parties. The Wisconsin court said: "The terms and conditions of this contract made Wald an independent contractor." The court in support thereof cited Badger Furniture Co. v. Industrial Commission, 200 Wis. 127, 227 N. W. 288, 290, in which there was no written contract and the court had to resort to letters and oral testimony. After so doing it said: "It is likewise clear that the parties themselves did not intend to create the relation of employer and employee."

Viewing the contract before us in the light of an earlier Wisconsin decision, Kneeland-McLurg Lumber Co. v. Industrial Commission and Eder et al, 196 Wis. 402, 220 N. W. 199, 200, in which the court said: "All of the provisions of the contract are clearly and definitely persuasive that the parties thereto had in mind the relationship of independent contractor or contractors, and not that of employer and employee," we cannot escape from the conclusion that such was the intention of the parties to the contract before us, and that such relation existed and did exist without change at the time that the respondent was injured.

We have reviewed the authorities presented by the respondent in endeavoring to uphold the verdict and judgment upon the theory that the rule of master and servant applied, and that the defendant Armour & Co. was liable. We are unable to give such a construction and effect to the facts before us. The particular facts in the instant case are perculiarly different from the facts in each of said cases relied upon.

Due to the interpretation of the contract between the parties and the evidence relating to the relationship existing between Armour & Co. and the other defendants in which we hold that the relationship of master and servant did not exist, but that the said Stoddard, Colby, and Hull were independent contractors, we expressly refrain from considering the references as to the liability insurance presented by the briefs, excepting to state that the case of Biggins v. Wagner, 60 S. D. 581, 245 N. W. 385, 387, 85 A. L. R. 776, which respondent urges, is not controlling in this case. In Biggins v. Wagner, supra, we said: "In this connection we wish to state that the mere fact that Fantle Bros., Inc., requested that it be, and was later informed that it was, protected by liability insurance against the negligent acts of Wagner, would not in itself, perhaps, be sufficient to take this question to the jury."

It will be observed that this court had in mind that, even in a contract providing for insurance, that in itself would not be sufficient to create a question of fact for the jury. The Biggins v. Wagner Case is clearly distinguishable from the case before us. There the evidence was conflicting. It was not a clear and unambiguous contract like the one before us. The record here is clear, and we are unable to find any testimony or evidence which would require the submission of the facts to the jury. The facts in this case are not at all alike and subject to the application of the rules of law which we held required the submission of fact to the jury in Biggins v. Wagner, supra.

We feel that it would not be wise to establish a principle, where parties have reduced their contracts to writing and defined their meaning by plain and unequivocal language, of subjecting their interpretation to the arbitrary and capricious judgment of persons unfamiliar with legal principles and settled rules of construction. In the Biggins v. Wagner Case this court had an entirely different situation in mind, for in it we said: "We thus have a sit-

uation where there is no specific or definite contract between the parties defining their rights and duties, and the only manner in which their rights and duties may be determined is from what actually transpired between them." And we further said: "The existence of this right could not be determined from any specific contract, because there was none." In the case at bar the contracts are specific, unambiguous, plain, and definite, and define the relationship existing between the parties.

██ ██ Upon a re-examination of all the evidence and the entire record and the motion for a directed verdict made by the appellant, we believe that the court should have directed a verdict for the appellant, as there was nothing for submission to a jury. In order that issues be submitted to a jury, the evidence offered must contain ultimate facts, and must be such that the application of normal intellectual faculties thereto might, by the customary and ordinary processes of reasoning, arrive at different judgments and conclusions. We find nothing in this record for a jury to consider, and, as said in other cases where the question of directing a verdict is involved, the judge, not only may, but should direct a verdict against the party having the burden of proof where such facts exist. The judge should have directed a verdict against the party having the burden of proof.

The order and judgment appealed from are reversed, with instructions to the circuit court to dismiss respondent's cause of action against the appellant herein and enter a judgment in its favor.

All the Judges concur.