Paul M. LAWRENCE, Plaintiff,

v.

Virgil E. VAIL, Administrator of the Estate of Philip L. Wineman, Deceased, and Oliver W. Nelson, d/b/a Nelson Laboratories, Defendants.

Civ. No. 1134.

United States District Court
D. South Dakota, S. D.

Oct. 28, 1958.

Deming Smith (of Davenport, Evans, Hurwitz & Smith), Sioux Falls, S. D., and John J. Greer (of James & Greer), Spencer, Iowa, for plaintiff.

F. M. Smith (of Woods, Fuller, Shultz & Smith), Sioux Falls, S. D., for defendant Vail.

Gene E. Pruitt and Acie W. Matthews, Sioux Falls, S. D., for defendant Nelson.

MICKELSON, Chief Judge.

Plaintiff, Paul M. Lawrence, a citizen of the State of Iowa, brings this action against defendants Virgil E. Vail, as administrator of the estate of Philip L. Wineman, deceased, and Oliver W. Nelson, d/b/a Nelson Laboratories, citizens of the State of South Dakota, for property damages and for personal injuries sustained in a motor vehicle accident which occurred in the State of Iowa. Plaintiff was operating a Chevrolet pickup truck which collided with an automobile owned and being driven by Philip L. Wineman, a salesman for Nelson Laboratories. Wineman died as a result of injuries sustained in the collision, and the defendant Virgil E. Vail is the duly appointed, qualified and acting administrator of his estate. The plaintiff sustained serious personal injuries and damages to his pickup and brings this action against the defendants for the sum of $81,971.35 as alleged damages.

The accident occurred on April 15, 1957, at approximately 6:00 P.M., on a blacktop county highway running north and south, at a point about two and three-quarters miles south of Lake Park, Iowa. The day was clear, visibility was excellent, the highway was dry, and the

road conditions were normal. The plaintiff was driving north in a 1951 Chevrolet pickup truck at a speed of between 35 and 40 miles per hour, on the blacktop, known as Dickenson County Road C. At a point two miles south of Lake Park, Highway C intersects Iowa Highway No. 9. When the plaintiff was about one mile south of this junction, he observed the decedent's automobile approaching from the north and in the west lane of traffic. The two vehicles were then less than one mile apart. Both vehicles entered depressions in the road. When plaintiff emerged from the depression, he was approximately 300 feet south of a driveway which led to a set of farm buildings to the east of the blacktop. At that point decedent's vehicle was in plaintiff's view, some 650 feet north of this driveway. Plaintiff estimated decedent's speed at approximately 60 miles per hour. Plaintiff had traveled about 100 feet north from the depression when he noticed that decedent's vehicle was crossing into his, or the east, lane of travel. Plaintiff slowed down, braked slightly, and moved closer to the ditch on his right. When he realized that a collision was inevitable, he braked the pickup to a full stop. Decedent continued south in plaintiff's lane of travel and collided with the plaintiff's vehicle with such force that the pickup truck was driven backward 18 inches from the point of impact. Evidence established that the plaintiff had driven his vehicle as far to the right side of the road as possible without going into the ditch. The ditch along the east side of the blacktop at the scene of the accident was from 4½ feet to 5 feet deep, and the road had a very narrow shoulder that slanted downward at a 45-degree angle. There was testimony to the effect that it would be extremely dangerous for a vehicle to attempt to leave the road and turn into the ditch and that to do so would in all probability result in an upset. The accident occurred wholly in the east lane of the highway and at a point about parallel with the south edge of the farm driveway. Plaintiff did not sound his horn nor make any effort to turn his pickup to the left after observing the decedent on plaintiff's side of the road. As a result of the accident, both vehicles were rendered a complete loss. Plaintiff suffered minor cuts and bruises, and in addition, the impact drove his right femur through the hip socket, shattering the socket and causing a severe fracture dislocation of the right hip. Decedent suffered multiple injuries, including a crushed chest, which resulted in his death several hours later. Before he died and within a short time of the accident, decedent said to one Hadley Schafer, a partner of the plaintiff, "I just didn't see him." Decedent also stated to a Dr. Coble, who accompanied him to the hospital, "I was looking for something."

The defendant Vail contends that the failure of Lawrence to sound his horn when he realized that the decedent was in the wrong lane of travel constituted contributory negligence on his part which was a proximate cause of the accident. We cannot agree with this contention. Plaintiff found himself in a dangerous situation entirely without fault on his part. He testified that between the time that he first saw Wineman move into his lane of travel and the moment of impact, no more than five or six seconds elapsed. Plaintiff had a right to assume that the decedent would return to his own lane of travel until it became apparent that decedent would not do so. When that time arrived, plaintiff had but one or two seconds to act. He was too far south of the driveway to turn into it; the ditch was steep and dangerous; he was already braking toward a stop; and it is highly speculative whether he could have turned to the left side of the road in time to avoid a collision when it was first apparent that a collision was inevitable. In the case of Zeller v. Pikovsky, 66 S.D. 71, 278 N.W. 174, 175, a case of similar facts, the court said:

"Plaintiff was driving on the extreme right of the highway and was in a situation where it was impossible on account of the condition of the ditch to his right to turn any

further in that direction. * * * It seems clear to us that the plaintiff had the right to assume that the defendant would control his truck in obedience to the law of the road and that his failure to comply gave rise to an emergency in which the plaintiff was required to act instantly. He was confronted with a situation of imminent danger requiring instant action and acting in an emergency not created by his own antecedent negligence was not guilty of negligence if he made such a choice as a person of ordinary prudence placed in such position might make even though he did not make the wisest choice. * * * If a duty on the part of a plaintiff on his proper side of the highway to sound his horn * * * existed, clearly it did not arise until he discovered that defendant did not intend to turn to the right. The evidence does not show that plaintiff knew in sufficient time or should have known that defendant would not control his truck in obedience to the law to permit plaintiff to take these precautions."

Counsel for the defendants have cited no Iowa cases which would contravene the statement of the South Dakota court. That Iowa applies the general principles of the so-called "emergency doctrine", see Rupp v. Kohn, 210 Iowa 969, 232 N.W. 174; Koob v. Schmolt, 241 Iowa 1294, 45 N.W.2d 216.

■ We find that under the evidence in this case, plaintiff was confronted with a sudden emergency not created by his own antecedent negligence, and that therefore his failure to act in any of the particulars suggested by the defendants did not constitute negligence on his part, and that the negligence of the decedent, Wineman, was the sole and proximate cause of the accident and the damages sustained by the plaintiff.

There remains the question of defendant Nelson's liability for the negligence of the decedent, Philip L. Wineman. On this question, it is the position of the plaintiff that the relationship of employer-employee, master-servant, or principal-agent existed between the defendant Nelson and the decedent, Wineman, at the time this accident occurred, and that therefore Nelson is liable for the negligence of the decedent under the doctrine of respondeat superior. The defendant Nelson, on the other hand, contends that none of such relationships existed, and that the decedent, Wineman, was, at all times material herein, acting as an independent contractor, and that therefore the defendant Nelson would not be liable for the negligence of the decedent.

■ As this court's jurisdiction depends upon the diversity of citizenship of the plaintiff and the defendants, and the accident occurred in the State of Iowa, the substantive law of that state would apply in determining the employment relationship of the defendants. This has been agreed to by all parties to this action. In determining the relationship which existed between the decedent, Wineman, and the defendant Nelson, we find no Iowa decisions, and none have been cited, where the fact situation was precisely the same as the facts in the instant case. However, the decisions of the Supreme Court of Iowa do make it abundantly clear as to the tests to be applied in determining such relationship.

In the landmark case of Mallinger v. Webster City Oil Co., 211 Iowa 847, 234 N.W. 254, at page 256, the court discussed the Iowa test for determining the relationship existing between an employer and his employee as follows:

"* * * the General Assembly of Iowa in the enactment of section 1421, par. 3(c), did not define the term 'independent contractor' used in said act. However, this court has held that the term 'independent contractor' does, despite the liberal interpretations of the act, retain its common-law meaning, and is still to be given the meaning that courts have always given the term. (case cited) This means that the

tests of the common law are applicable, and none other."

It is well settled that the principal common-law test used in determining the employment relationship is the "right of control" test. War Emergency Co-op Ass'n v. Widenhouse, 4 Cir., 169 F.2d 403; Venuto v. Robinson, 3 Cir., 118 F.2d 679; Hassebroch v. Weaver Construction Co., 246 Iowa 622, 67 N.W.2d 549; Banks v. Carrell, 241 Iowa 786, 43 N.W.2d 142; McDonald v. Dodge, 231 Iowa 325, 1 N.W.2d 280; Heintz v. Iowa Packing Co., 222 Iowa 517, 268 N.W. 607; Steen v. Potts, 75 S.D. 184, 61 N. W.2d 825; Halverson v. Sonotone Corp., 71 S.D. 568, 27 N.W.2d 596; Baer v. Armour & Co., 63 S.D. 299, 258 N.W. 135; Cockran v. Rice, 26 S.D. 393, 128 N.W. 583; Ozan Lumber Co. v. McNeely, 214 Ark. 657, 217 S.W.2d 341, 8 A.L.R. 2d 261. The "right of control" test has been defined in Iowa as follows:

"* * * the important test is the degree of retention by the principal of the right to control the details of the work, as well as the result. Where there is the right to control manner and means of performance, there is an employer-employee relation. Where, however, the subordinate is free to execute the work without being subject to the orders of the principal as to details, he is an independent contractor." McDonald v. Dodge, supra, 1 N.W.2d at page 282.

"The control necessary to render a subordinate an employee must be authoritative control as distinguished from mere suggestion or cooperation as to detail." Ibid., 1 N.W.2d at page 283.

That the Iowa courts consider other tests in connection with the "right of control" test is demonstrated by the case of Mallinger v. Webster City Oil Co., supra. The Iowa court stated there [211 Iowa 847, 234 N.W. 256]:

"Before passing to the analysis of the written contract in question, it may be well to examine and analyze the usual legal tests that are adopted by courts in determining whether or not a person classifies as an independent contractor under the facts and circumstances of a given case. The term has a fairly well-defined meaning under the decisions of many jurisdictions, including our own. An independent contractor under the quite universal rule may be defined as one who carries on an independent business and contracts to do a piece of work according to his own methods, subject to the employer's control only as to results. The commonly recognized tests of such a relationship are, although not necessarily concurrent or each in itself controlling:

"(1) The existence of a contract for the performance by a person of a certain piece or kind of work at a fixed price; (2) independent nature of his business or of his distinct calling; (3) his employment of assistants with the right to supervise their activities; (4) his obligation to furnish necessary tools, supplies, and materials; (5) his right to control the progress of the work, except as to final results; (6) the time for which the workman is employed; (7) the method of payment, whether by time or by job; (8) whether the work is part of the regular business of the employer. If the workman is using the tools or equipment of the employer, it is understood and generally held that the one using them, especially if of substantial value, is a servant."

The facts of the case as they apply to this question are as follows: The defendant Oliver W. Nelson, d/b/a Nelson Laboratories, is located in Sioux Falls, South Dakota, and was engaged at the time of the accident in the sale of wholesale veterinary medicines and supplies. He operated in a territory that covers the states of North and South Dakota, Nebraska, Iowa and Minnesota, and parts of Wisconsin and Illinois. At the time of the accident, Nelson

employed two salesmen, including the decedent, to contact the veterinarians in this territory. Wineman had worked as a salesman for Nelson for 15 consecutive years prior to his death. There was no written agreement covering the relationship between the two parties. At the time Wineman was first employed, he had no previous veterinary supply salesman experience, and Nelson took him around, showed him the territory, and introduced him to prospective veterinarian customers. When Wineman was hired, he was the only salesman in the territory. In 1948 a second salesman was added, and Wineman's territory was restricted to the state of Iowa, part of Nebraska, and part of Illinois. The territories of the two salesmen did not overlap. Wineman's compensation was based on commissions only, with no basic guarantee, but he had a weekly "draw against commissions" of $150 and was allowed to receive this draw even when on vacation. His duties for Nelson were to sell medicines and supplies to the veterinarians whom he contacted. He was not generally required to collect for the sales he made, but the billing for each order was made directly by Nelson Laboratories to the veterinarians. However, sometimes Wineman did collect from the veterinarians and received no extra pay for such services. Nelson testified that such was considered part of Wineman's job. He would occasionally deliver merchandise to veterinarians and he received no extra pay for this. He was not required to attend any sales meetings, and although he was on his way to a veterinarian's meeting in Illinois at the time of the accident, Nelson testified that Wineman was not required to attend this meeting and that the trip was as much for Wineman's benefit as for Nelson's. Nelson required Wineman to telephone or send in by mail all orders received by him while working his territory. Nelson knew exactly where Wineman was going on this particular trip. He did testify, however, that ordinarily he only knew the general direction of Wineman's other trips,

and that if it was necessary to get in touch with him, he would ascertain his location from Wineman's wife. Wineman chose his own hours of work, days of work, his vacation time, his exact route of travel, whom he would call upon, and in general developed his own trade. Wineman owned his own car and paid his own travel expenses. Nelson furnished Wineman with samples of the medicines, with memo pads, calendars and other advertising supplies for distribution to the veterinarians in the course of his dealings with them. He withheld Federal income tax from Wineman's commissions; he deducted South Dakota unemployment compensation tax from Wineman's commissions; he included Wineman in his workmen's compensation coverage; and he purchased an automobile liability insurance policy which specifically protected Nelson from any liability for the negligence of Philip L. Wineman. On June 21, 1957, before the Iowa Industrial Commission, Nelson stipulated in a compromise settlement of a death claim by the widow of Philip L. Wineman that said Philip L. Wineman, deceased, "on the 15th day of April, 1957, sustained a certain fatal injury to his person arising out of an accident occurring in the State of Iowa while in the course of his employment with and for Oliver W. Nelson, doing business as Nelson Laboratories."

Plaintiff contends that the above recited facts clearly show that the relationship between Nelson and Wineman was that of master-servant or employer-employee, that they conducted their activities consistent therewith, and that the defendant Nelson, by his own acts and conduct, has at all times demonstrated that he regarded Wineman as being his employee or servant.

■ We believe the facts in this case meet the requirements of the "right of control" test and the other auxiliary tests as expressed in the Mallinger case and other Iowa decisions. Here, the decedent, Wineman, was working on a continuing job of some 15 years duration,

and while he was paid on a commission basis and not by salary, he was allowed a substantial weekly draw on his commissions. In the Iowa decisions, emphasis is placed on whether the business of the employee was by nature independent of the employer's occupation or dependent on it. See Mallinger v. Webster City Oil Co., supra; Heintz v. Iowa Packing Co., supra; Lembke v. Fritz, 223 Iowa 261, 272 N.W. 300; In re Estate of Amond, 203 Iowa 306, 210 N.W. 923. Here, the facts indisputably show that Wineman did not carry on an independent occupation. It was not distinct from the work of Nelson Laboratories, but rather was an integral part of it. As above stated, Nelson deducted from Wineman's commissions, amounts to cover Federal income tax and South Dakota unemployment tax; he carried workmen's compensation insurance; and he purchased an automobile liability policy which protected him as Wineman's employer. These facts substantially disprove that the work of Wineman was independent from the work of Nelson.

From the evidence it appears that Wineman had no authority whatever to employ assistants. This is a strong inference of Nelson's right to control and supervise the activities of Wineman. It was admitted by Nelson that he could and would have discharged Wineman if he had not produced business for Nelson. This, too, is a strong inference of Nelson's right of control. Niemann v. Iowa Electric Co., 218 Iowa 127, 253 N.W. 815, 818; Franks v. Carpenter, 192 Iowa 1398, 186 N.W. 647, 648; Halverson v. Sonotone Corp., supra; Biggins v. Wagner, 60 S.D. 581, 245 N.W. 385, 85 A.L.R. 776; Cockran v. Rice, supra. In the Niemann case the Iowa court said [253 N.W. 818]:

"The authorities generally hold that notwithstanding a written contract, if the master retains control and direction of the men, with the right of fixing their pay and the right of discharging whom he pleases, with power of control over the employees, the relationship of inde-

pendent contractor is not created, and the acts and conduct of the parties will govern their relationship."

An important point in considering whether the relationship was one of employer-employee is whether Nelson or Wineman furnished the necessary tools to carry on Wineman's job. Wineman, it is true, furnished his own car and paid for its upkeep with Nelson supplying only the advertising samples and supplies. While this element is considered important in the Iowa interpretation of the "right of control" test, as was stated in the Mallinger case, 234 N.W. at page 256, "The commonly recognized tests of such a relationship are * * * not necessarily concurrent or each in itself controlling * * *"

We recognize that in the following cases which held the relationship of master-servant to exist between the parties, the employer supplied the tools of the profession. Heintz v. Iowa Packing Co., supra; Lembke v. Fritz, supra; Towers v. Watson Bros. Transp. Co., 229 Iowa 387, 294 N.W. 594. We also recognize the following Iowa cases holding that the relationship was one of independent contractor considered in their analysis that the employee supplied the tools and not the employer. Burns v. Eno, 213 Iowa 881, 240 N.W. 209; McDonald v. Dodge, supra; Hassebroch v. Weaver Construction Co., supra; Taylor v. Horning, 240 Iowa 888, 38 N.W.2d 105. However, in none of the latter cited four cases was the question of who furnished the tools the controlling criteria. Nor was there such a strong showing of the intention of the parties that the relationship should be considered that of master-servant as there is in the instant case. It is evident from a close reading of these cases that the evidence in each was overwhelming in favor of a finding of an independent contractor relationship.

In the instant case, Wineman had a restricted territory. In 1948 Nelson restricted Wineman's territory to the state of Iowa, parts of Nebraska and Illinois, and assigned the remainder of Wine-

man's former territory to a second salesman. The two salesmen did not, thus, compete with each other, as would ordinarily be true of automobile salesmen, who have been held to be independent contractors. This is further evidence of Nelson's right of control.

While in some respects the facts in the Mallinger, Lembke and Towers cases, supra, may be said to be stronger as a basis for holding that the employer-employee relationship existed than in the instant case, there are present here certain very important facts which were not present in any of those cases. Here, Nelson carried a policy of liability insurance which protected him against the negligence of Philip L. Wineman (Wineman being specifically named therein); he included Wineman in his workmen's compensation coverage; and he made deductions from Wineman's commissions for Federal income tax purposes. This is evidence having a tendency to negative the independence of the contract, or in other words, having a tendency to show that Wineman was considered by Nelson as his employee. Annotation, 85 A.L.R. 784. The courts are almost unanimous in giving consideration to such evidence as bearing on the question of the relationship of the parties. See cases cited in Annotation, 85 A.L.R. 784. The South Dakota court, for example, has held that such evidence creates an inference which negatives the independence of the employment contract. Halverson v. Sonotone Corp., supra; Biggins v. Wagner, supra. The Iowa Supreme Court has considered such evidence in the same light. In Towers v. Watson Bros. Transp. Co., supra, the court commented on the fact that Watson carried a regular policy of insurance on his employees, which policy did not specifically mention the employee in question, and held that such was further evidence of the intention of the parties to the contract that the relationship was to be considered one of master-servant. The court quoted with approval from Biggins v. Wagner, supra. In Burns v. Eno, supra, the court in holding that the

relationship was one of independent contractor, considered the absence of any liability insurance on the employees. In Hassebroch v. Weaver Construction Co., supra, the court took into consideration the fact that the construction company sought to be held as an employer withheld income tax, social security and unemployment compensation tax from their regular truck drivers but that decedent and his drivers had no such deductions taken from their pay. The court held from all the facts decedent was an independent contractor.

■ Plaintiff contends that because Nelson signed the stipulation settling the death claim of the widow of Philip L. Wineman, deceased, before the Iowa Industrial Commission and admitted therein that Wineman was his employee and was, at the time of the accident, acting in the course of his employment, Nelson was therefore judicially estopped in this case to deny the relationship of master-servant. While there seems to be some split of authority, the general rule as to judicial estoppel appears to be that the parties in the two proceedings must be the same, and that actions in former proceedings which might be a basis for an estoppel will not operate for the benefit of persons who were not parties to the former proceedings. See Smith v. John Hancock Mutual Life Ins. Co., 231 Iowa 1202, 3 N.W.2d 538. Although we feel that the statement made by Nelson in the Iowa workmen's compensation settlement stipulation did not estop him from asserting the contrary in this action, such a statement is properly before the court as an admission against interest. Smith v. John Hancock Mutual Life Ins. Co., supra. Nelson's admission in that proceeding that Wineman was his employee is evidence of Nelson's recognition of the employer-employee relation between them.

■ Defendant Nelson contends that while evidence of this nature might indicate what the parties considered the relationship to be in South Dakota, yet it should not be regarded as any indication of what they considered their rela-

tionship to be in the State of Iowa. While there might be some merit to this contention in regard to the withholding of commissions to pay South Dakota unemployment compensation taxes, we find no merit in these contentions as to the withholding of Federal income tax, the purchasing of the policy of liability insurance, and the inclusion of Wineman in his workmen's compensation coverage. From the time of hiring Wineman until his death, Nelson knew and intended that Wineman would travel in Iowa and in other states comprising his territory. It is a fair inference from the evidence that Nelson purchased the liability insurance and included Wineman under his workmen's compensation policy to protect himself from liability in case an accident should happen anyplace within Wineman's territory. It would be absurd to hold that the purchasing of a liability insurance policy was evidence of an employment relationship in South Dakota but not evidence of such a relationship in Iowa, especially since Iowa was Wineman's major territory and since the laws of the two states do not conflict as to the requirements for such a relationship. McDonald v. Dodge, supra; Towers v. Watson Bros. Transp. Co., supra; Halverson v. Sonotone Corp., supra; Biggins v. Wagner, supra.

A review of the whole evidence shows that Nelson, from the first day of Wineman's employment to the time of the settlement with Wineman's widow, considered the relationship to be that of master-servant or employer-employee; that Wineman's work was wholly dependent on the business of Nelson; that at various times, Wineman acted as an agent of Nelson, under a fiduciary relationship to him, by virtue of handling Nelson's funds; Burns v. Eno, supra, 240 N.W. at page 211; and that notwithstanding the fact that Wineman furnished his own automobile, chose his own route of travel, the hours of his work, etc., Nelson had the right to control the means by which Wineman accomplished his work. For all of the reasons hereinbefore stated, we find that

Wineman was the employee of Nelson, that he was in the course of that employment at the time of the accident in question, and that because of his negligence, Nelson is liable under the doctrine of respondeat superior to the plaintiff for the damages plaintiff sustained.

On the question of damages, it was stipulated that the fair market value of plaintiff's pickup truck which was totally destroyed was $500. To the time of the trial, plaintiff had incurred total expenses for his personal injuries in the sum of $3,022. As a result of the accident, plaintiff suffered painful, serious and permanent injuries which may be summarized as follows: a bruise to the left cheek, lacerations to the chin and left knee, and a fracture dislocation of the right hip, the most serious injury being the fractured right hip. Under the care of Dr. Donald F. Rodawig, he spent nine weeks in traction in a Spirit Lake, Iowa, hospital. Not being satisfied with the results of his treatment by Dr. Rodawig, he consulted with doctors at Sioux Falls, South Dakota, Mayo Brothers Clinic in Rochester, Minnesota, and Fort Dodge, Iowa. He was finally placed under the care of Dr. Carroll B. Larson, an orthopedic surgeon at the University of Iowa. Dr. Larson performed an arthroplasty operation on the hip, in which the old hip joint cartilage was removed and a new joint constructed. The evidence discloses that he will always have a mild adduction limp; he has a flexion contracture of the hip of 15 degrees; and his right leg is shortened three-quarters of an inch. He still experiences mild discomfort in the hip at extremes of motion, and his daily normal activity has been lessened. He now has a 32 per cent partial permanent disability which should be reduced through normal recovery to a partial permanent disability of 25 per cent.

While there is some dispute as to the extent of plaintiff's pain, there is little doubt but that he suffered considerable pain as a result of his injuries and the treatment of the same, at least until after his recovery from the operation per-

formed by Dr. Larson. He was at the time of the trial and will in the future be unable to tie his shoelaces, put on his socks, squat, or sit comfortably on the toilet. He cannot walk for more than a short distance without discomfort and tiring.

He is unable and will be unable to perform the work he was doing prior to the accident. Before the accident, he was in a partnership with Hadley Shafer in Lake Park, Iowa, in the plumbing and heating business. Plaintiff did most of the plumbing work. Prior to this partnership, plaintiff farmed. His whole life has been devoted to manual labor, and it seems unlikely that he will be able to obtain employment which does not require physical labor. Prior to the accident he was a healthy man and, though presently 65 years of age, capable of working several more years in his business. The partnership between Lawrence and Shafer was dissolved in January, 1958. He received $15,000, representing his one-half of the value of the partnership. For the five years prior to the accident, he had an annual income from the partnership as follows:

| For the year 1953, | $1,624.22 |
| For the year 1954, | $3,275.40 |
| For the year 1955, | $1,294.03 |
| For the year 1956, | $2,661.73 |
| For the year 1957, | $2,885.00 |

Though plaintiff lost some eight months working time in 1957, it does not appear that he suffered any loss of earnings for that year. His average income for the past five years was $2,522. He had a life expectancy of 12.11 years. While he may be able to do light work such as selling merchandise from the floor of a retail store, as was urged by the defendants, it is speculative to say the least as to whether such a position will be available to a man his age.

We therefore find that the plaintiff is entitled to recover from the defendants his special damages amounting to the sum of $3,522, and the sum of $20,000 for his pain and suffering, permanent disability, loss of earnings to the time of trial and the loss of his future earning capacity, amounting in the aggregate to the sum of $23,522.

Counsel for the plaintiff will prepare and submit to the court, upon five days notice to counsel for the defendants, proposed findings of fact, conclusions of law and judgment in accordance with this memorandum decision.