CECELIA LAURIE, A MINOR, BY ERLENE LAURIE,
HER MOTHER AND NATURAL GUARDIAN,
AND ANOTHER v. RALPH MUELLER
AND OTHERS.
HAWS REALTY COMPANY, APPELLANT.

78 N. W. (2d) 434.

May 4, 1956—No. 36,681.

*Freeman, Peterson, Hoppe & Gaughan* and *Thomas Burke,* for appellant.

*Durham, Swanson & Lasley,* for respondents.

MURPHY, JUSTICE.

The two actions involved in this appeal were originally brought by Cecelia Laurie, a five-year-old minor, through Erlene Laurie, her mother and natural guardian, and by the mother in her own behalf for damages resulting from the alleged negligence of defendant Ralph Mueller in dropping a hunting knife so that it was deflected into the child's eye resulting in the necessary removal of the eye. Mueller was employed as a caretaker in an apartment building owned by defendant Haws Realty Company. Before the trial the district court granted plaintiffs' motion to dismiss the actions without prejudice as to defendant Mueller and defendant L. L. Hanson, Inc., which company was Haws Realty's rental agent. After verdicts for the plaintiffs, the Haws Realty Company, hereinafter called defendant, moved for judgment notwithstanding the verdicts or in the alternative for a new trial. From the denial of that motion, the defendant

appeals. It contends that the trial court erred in refusing to grant a directed verdict at the close of all the evidence and in giving certain instructions to the jury in regard to scope of employment.

The plaintiffs, mother and daughter, were tenants of the defendant company, which owns and operates an apartment building containing 19 apartments. The apartment occupied by plaintiffs adjoined the basement apartment of the caretaker, Ralph Mueller. Use of the apartment was included as part of Mueller's compensation as caretaker. It was customary for tenants in the apartment house to make complaints in regard to the upkeep of their respective apartments to Mueller, or in his absence his wife, in their apartment. There was no other place on the premises where tenants could make complaints.

On November 16, 1951, Mrs. Laurie took her five-year-old daughter Cecelia in hand and proceeded next door to the Mueller apartment. Her purpose in so doing was to complain about leaking plumbing fixtures in the Laurie apartment. There was testimony at the trial attempting to show that Mrs. Laurie had visited the Muellers for the purpose of using their telephone, as the Lauries did not have one, but because of the jury's finding for the plaintiffs, we must assume that she did enter for the purpose of making a complaint. The record does show, however, that Mrs. Laurie was fairly well acquainted with the Muellers through the use of their telephone. At the time of Mrs. Laurie's visit, Mr. Mueller was not home, but upon Mrs. Mueller's invitation, Mrs. Laurie went into the apartment with the child. After entering, Mrs. Laurie sat down upon a couch immediately to the left of the door and carried on a conversation with Mrs. Mueller who was ironing clothes at the time. There was a large overstuffed chair in the room to the right and about six feet back of the door.

A short time later at about 4 p. m. Mr. Mueller came in with a package containing a hunting knife and mitts which he had purchased in preparation for a contemplated hunting trip. The remainder of his hunting equipment had recently been brought into the apartment from a locker where it had been kept in storage. Upon entering, Mueller showed the knife to Mrs. Laurie who took it in her

4

hands. There is a dispute in the testimony as to whether the knife was encased in the sheath when he handed it to her. At any rate, she returned it to him after which he took the sheathed knife to his wife who was across the room. As he was about to hand it to her, the knife fell from the sheath. It struck the overstuffed chair, deflected, and the point struck the eye of the child who was sitting beneath the arm of the chair. The accident necessitated an operation to remove the eye later that day. Mueller testified that at no time did he make any observation as to whether the sheath was snapped or not as he carried it over to his wife. Mrs. Laurie at no time prior to the accident made the complaint she had intended to make in regard to the faulty plumbing in her apartment.

The determinative issue is whether the alleged negligence of Mueller in dropping the knife occurred within the scope of his employment so as to bind his employer under the doctrine of respondeat superior. In the modern concept of respondeat superior the law holds the master liable for the torts of his servants even though no fault personally rests upon the master. This doctrine of vicarious liability of the master rests upon the sound principle that, if an employer expects to derive certain advantages from the acts performed by others for him, he, as well as the careless employee, should bear the financial responsibility for injuries occurring to innocent third persons as a result of the negligent performance of such acts.[1] But this responsibility is not carried to the point where an employer is absolutely liable for every tortious act of his employees, and there is incorporated within the doctrine a requirement that the servant's acts must be within the scope of his employment in order that the employer may be held liable.[2] Because the term "scope of employment" is impossible of concrete definition, its application must depend upon the circumstances of each individual case.[3]

---

[1]See, e.g., Elliason v. Western Coal & Coke Co. 162 Minn. 213, 202 N. W. 485.

[2]Morier v. St. Paul, M. & M. Ry. Co. 31 Minn. 351, 17 N. W. 952.

[3]E.g., Penas v. Chicago, M. & St. P. Ry. Co. 112 Minn. 203, 127 N. W. 926, 30 L.R.A. (N.S.) 627.

In the present case we have a situation in which the employee had no set time during which he was to carry out the functions required by his employer. In addition to his normal caretaking duties, he was to receive in his own apartment what might be completely unexpected complaints in respect to the apartments rented by tenants. His own home, therefore, became the center of what might be termed both "work functions" and "living functions." The problem here grows out of the dual nature of Mueller's presence on the premises and requires a distinction between his "work functions," which he performed for his employer, and the enumerable acts of a purely personal nature, which his employer could not foresee and for which the employee alone would be responsible. Restatement, Agency, § 235, provides that the act of a servant is not within the scope of his employment "if it is done with no intention to perform it as a part of or incident to a service on account of which he is employed."[4] The act is thus within the scope of employment if the servant is actuated in some degree to serve his master.[5]

Although Mrs. Laurie came into the apartment to make a complaint, this fact was not communicated to Mueller or to his wife. Mueller could not have known of her purpose, and might well have believed her to be there to use the telephone, as she had in the past, or to visit with his wife. It is therefore difficult to conceive of his act in attempting to show Mrs. Laurie and his wife the newly purchased knife as even remotely being an act in any way resulting from a purpose to serve his employer. Nor was his act of exhibiting the knife an activity which the owners of the building authorized the caretaker to carry on. It is obvious that the handling of the knife by Mueller was solely a personal matter in no way related to his duties as a caretaker.[6]

However, the plaintiffs contend that the act of bringing the knife into the apartment was an act "incident to a service on account of

---

[4]See, Tomlinson v. Sharpe, 226 N. C. 177, 37 S. E. (2d) 498; Wells v. Northern Indiana Public Service Co. 111 Ind. App. 166, 40 N. E. (2d) 1012.

[5]Restatement, Agency, § 235, *comment a.*

[6]See, Swanbeck v. Hubbard, 336 Ill. App. 384, 84 N. E. (2d) 159.

6

which he * * * [was] employed."[7] This position is clearly illustrated by an instruction given the jury by the trial court and objected to by the defendant as not being the law in this state:

"Where an employee is required to live on the premises where employed, either by contract or the necessities of his work, *performance of ordinary acts relating to his life, comfort and convenience, although strictly personal to himself* and not acts of service, *are incidental to the service,* and hence within the 'scope' and in the 'course of his employment' even though he is not actually performing the particular tasks for which he was employed." (Italics supplied.)

In supporting their position plaintiffs cite Adams v. American President Lines, 23 Cal. (2d) 681, 146 P. (2d) 1, which was also relied upon by the trial court. In that case a seaman sought to recover damages under the Federal Employers' Liability Act[8] which was made applicable to seamen by the Jones Act.[9] The injury resulted when the seaman slipped on an orange peel which had been cast onto a stairway by crewmen of the ship while eating oranges which had been served at the mess. It was a common practice for the men to stand around eating oranges and casting the peels on the deck or aiming for but missing the garbage receptacle placed near the head of the stairway. In holding the employer liable, the court quoted the applicable rule from Whiting-Mead Commercial Co. v. Industrial Acc. Comm. 178 Cal. 505, 507, 173 P. 1105, 1106, 5 A. L. R. 1518, as follows (23 Cal. [2d] 685, 146 P. [2d] 3):

"* * * 'Such acts as are *necessary* to the life, comfort, and convenience of the servant while at work, though strictly personal to himself, and not acts of service, are incidental to the service, and injury sustained in the performance thereof is deemed to have arisen out of the employment. A man must breathe and occasionally drink water while at work. In these and other conceivable instances he ministers unto himself, but in a remote sense these acts contribute

[7] Restatement, Agency, § 235.
[8] 35 Stat. 65, as amended, 45 USCA, §§ 51 to 60.
[9] 41 Stat. 1007, 46 USCA, § 688.

to the furtherance of his work. * * * That such acts will be done in the course of employment is necessarily contemplated, and they are inevitable incidents.' " (Italics supplied.)

The court began its discussion by asserting "Cases under workmen's compensation laws are typical," and then went on to rely upon several workmen's compensation cases including the Whiting-Mead case.

As has been clearly pointed out, however, the "scope of employment" concept in vicarious tort liability rests upon an entirely different rationale than the "arising out of and in the course of employment" standard of workmen's compensation.[10] This proposition was recognized by this court in Frankle v. Twedt, 234 Minn. 42, 50, footnote 5, 47 N. W. (2d) 482, 488, footnote 4. Moreover, workmen's compensation statutes are liberally construed[11] so as to effect the policy behind their adoption. The fact that the California court in the Adams case applied a liberal construction is emphasized by their statement in regard to the Federal Employers' Liability Act that "It has been said that the Federal Employers Liability Act must be construed liberally to fulfill the purposes for which it was enacted."[12]

The trial court has supported the contentions of the plaintiffs' counsel by applying to the facts in this case the customary approach to liability in workmen's compensation cases. We recognize that the doctrine of respondeat superior has been influenced by changing social and economic conditions and has had a gradual and extending

[10]"* * * workmen's compensation is a *type of social insurance* designed to protect the workers against *occupational* hazards of a particular class. * * * it would be wholly erroneous to think that the techniques used for the proper allocation of certain industrial hazards could be correctly transposed for the distribution of hazards of a totally different kind and involving a separate class of persons subjected to such exposure. * * * [Workmen's compensation] is a special branch of social insurance for workers which does not merely modify or replace tort liability, but constitutes a novel and independent system of legal relations." Riesenfeld & Maxwell, Modern Social Legislation, p. 139. See, also, Id. pp. 234 to 235; Riesenfeld, *Forty Years of American Workmen's Compensation,* 35 Minn. L. Rev. 525, 531.

[11]See, 6 Dunnell, Dig. & Supp. § 10385.

[12]23 Cal. (2d) 687, 146 P. (2d) 4.

8

application. As stated in Higbee Co. v. Jackson, 101 Ohio St. 75, 79, 128 N. E. 61, 62, 14 A. L. R. 131, 134:

"* * * The rule itself, and its development, is an example of the process by which the judgment of society as to what is necessary to the public welfare has from time to time been expressed in juristic forms."

While the approach adopted by the trial court may not be entirely unrealistic in light of the development of the doctrine of respondeat superior, we do not think it should be extended so as to in effect hold the employer to be an insurer. We do not feel on the basis of the record in this case that the doctrine as established in our law[13] should be extended so as to permit standards of liability in workmen's compensation matters to seep over into common-law negligence, nor do we believe that the variant policies behind the two concepts warrant that they be similarly treated.[14]

However, even if the liberal rule as applied in the Adams case were to be extended to the facts in the present case, Mueller would not be found to be acting within the scope of his employment. Although the trial court in his instructions used the much broader phraseology "performance of *ordinary acts relating* to his life, comfort and convenience" (italics supplied) in defining acts incidental to employment, the Adams case used the language "Such acts as are *necessary* to the life, comfort, and convenience of the servant while at work." (Italics supplied.) The seamen in the Adams case were engaged in a necessary incident of life, that is, completing a meal, as well they might if they had been getting a drink of water or smoking a cigarette.[15] Certainly that act was necessarily contemplated by the employer. In the instant case, however, the showing of the hunting knife was surely not within the contemplation of his employer as

[13]See, Penas v. Chicago, M. & St. P. Ry. Co. 112 Minn. 203, 127 N. W. 926, 30 L.R.A.(N.S.) 627.

[14]See footnote 10, *supra.*

[15]See, DeMirjian v. Ideal Heating Corp. 129 Cal. App. (2d) 758, 278 P. (2d) 114 (fire resulting from employee attempting to smoke in the washroom).

being a *necessary* incident to the employee's life, comfort, or convenience. Moreover, the California court was concerned with a case in which the employer had a great deal of control over the employees and thus many of the employee's necessary activities could well be deemed within the scope of his employment. This is borne out by the court's statement that "His employment requires him to spend his entire time on the vessel while it is at sea. His time is never wholly his own. On his hours off he is subject to call to duty in an emergency. Necessary incidents of life, therefore, such as sleeping, eating, washing, etc., are contemplated to be within the scope of the employment."[16]

The Minnesota cases support the position of defendant here. The rule was early laid down by this court, speaking through Mr. Justice Mitchell, that if the servant is acting for himself as his own master, the master is not liable.[17] Thus "If the servant step aside from his master's business, *for however short a time,* to do an act not connected with such business, the relation of master and servant is for the time suspended."[18] In Larson v. Duluth, M. & N. Ry. Co. 142 Minn. 366, 172 N. W. 762, a "gang boss" of a railroad crew was engaged with fellow employees in removing a platform at one of the railroad stations. A member of the crew found a revolver in a leather case, which had been hidden under the platform by some unknown person, and handed it to the "boss." In attempting to break open the gun, he discharged it resulting in injuries to the plaintiff. In that case this court said (142 Minn. 375, 172 N. W. 765) :

"In the instant case defendant did not own or control the revolver, and had no previous knowledge of its presence on the premises. It was wholly foreign to any business in which defendant's crew were engaged. To remove it from the premises was the utmost that the proper prosecution of defendant's undertaking required. While it remained in its case it was harmless and could have been removed without danger to anyone. The danger arose solely from handling

[16]23 Cal. (2d) 687, 146 P. (2d) 4.

[17]Morier v. St. Paul, M. & M. Ry. Co. 31 Minn. 351, 17 N. W. 952.

[18]31 Minn. 353, 17 N. W. 953.

and manipulating it. While handling and manipulating it, Mayer was not engaged in furthering any business of defendant, but had stepped aside from that business and was engaged in an affair personal to himself which had no connection therewith. Our conclusion is that he was not acting within the scope of his employment and that defendant is not liable for his act."

Also in point is Kostas v. Davis, 155 Minn. 385, 193 N. W. 693, in which a section hand on a railroad was injured by the discharge of a gun which was being carried on a motor pushcar while the crew was returning to the station house at the close of the day. The gun was owned by one of the crew. In indicating that the use of the gun was without the scope of employment of the men, the court said: "The company had no use for the gun. It was not used in its business nor to forward its interests. It was used for the pleasure and incidental advantage of the men."[19]

Although it becomes no pleasant task to deny recovery in a case such as this, there must, in accordance with the doctrine of respondeat superior, be certain limits placed upon the liability of an employer. We do not mean to imply that, had the accident occurred while Mueller was processing the tenant's complaint and had the handling of the knife been in someway incident thereto, we would reach the same result. Under the facts of the present case, however, Mueller was pursuing his own personal ends and was not acting with any intent to carry out any act which was part of, or incidental to, the duties for which he was employed.

Reversed with instructions to enter judgment for defendant Haws Realty Company.

THOMAS GALLAGHER, JUSTICE (dissenting).

I am of the opinion that the evidence presented created a fact issue for the jury.

---

[19] 155 Minn. 387, 193 N. W. 693.