# MABEL BOLAND, BY WILLIAM ORR, HER GUARDIAN, v. CHARLES HENRY MORRILL AND OTHERS.

132 N. W. (2d) 711.

January 8, 1965—No. 39,320.

*Robb, Robb & Van Eps,* for appellant.

*Nemerov, Perl, Spector & Hunegs* and *Hansen & Grinley,* for respondent.

KNUTSON, CHIEF JUSTICE.

This case arises out of a collision between an automobile driven by Lee Boland, in which plaintiff, Mabel Boland, was riding as a passenger, and an automobile driven by Charles Henry Morrill. The case was submitted to the jury on a special verdict. The jury found that both drivers were guilty of negligence; that the negligence of Charles Henry Morrill was a proximate cause of the accident; and that the negligence of Boland was not. After denial of a post-trial motion for judgment notwithstanding the findings of fact of the court made pursuant to the jury's verdict or in the alternative for a new trial, defendant Olson Manufacturing Company appeals.

The motion for judgment notwithstanding the findings of fact is based on the contention that at the time of the collision Charles Henry Morrill was not an employee of Olson Manufacturing Company and that, if he was, he was not then engaged in the scope of his employment. The motion for a new trial is based upon alleged errors in the receipt of evidence and misconduct of counsel in his argument to the jury, which will be discussed hereinafter. For the purpose of this appeal, both parties assume that the negligence of defendant Morrill was the sole proximate cause of plaintiff's injury. The principal questions

involved are whether Morrill, at the time of the collision, was an employee of Olson Manufacturing Company and, if so, whether he was engaged in the scope of his employment at the time of the collision.

Olson Manufacturing Company, hereinafter referred to as Olson, is in the business of manufacturing and selling farm equipment. Morrill had been selling such equipment for Olson on a year-round basis since 1952. The accident occurred in the early afternoon of December 15, 1961. While there is conflict in the evidence, the jury could find that Morrill was given his own exclusive territories in which to sell but that he could also sell in "open" territory not assigned to other salesmen. This testimony is disputed by Olson, who stated that Morrill had no exclusive territory but that he could not sell in areas which had been assigned to others. At any rate, Morrill did not sell in the territory from which he was excluded. Morrill testified that if another salesman sold in his territory he would receive a commission on such sale.

Morrill sold equipment under two distinct arrangements. He sold to farmers and to dealers of his own on a basis where he would buy from Olson and resell. Under this arrangement he would set his own price for resale and make his own arrangements for credit with the farmers and dealers. While Olson preferred that Morrill sell at suggested retail prices, he was not bound to do so, and he often sold below the suggested price. He paid Olson with his own money for the items so sold before delivering them and did his own billing on these particular sales. If he had the article with him he would deliver it when sold; otherwise he might deliver it later or have Olson deliver it.

Olson also had established dealers. Morrill sold to such dealers and was paid a commission on these sales monthly. This commission consisted of the difference between the wholesale price and the price at which he sold. Under this arrangement, Olson billed the dealers and usually made its own check on the credit of the dealers, although it sometimes relied upon Morrill's word as to the customer's credit. Risk of nonpayment of the price of these sales rested with Olson, but Morrill would not receive his commission if the purchase price was not paid.

Including Morrill, Olson employed seven men to sell farm equipment. Olson admits that the other six are salesmen but claims that Morrill

cannot be so classified. Each salesman is treated differently. Some sell on commission plus expenses, and some sell on salary plus commission. Morrill was the only one who sold on a straight commission or, as we have described above, on a buy-sell arrangement.

Morrill had no quota imposed upon him by Olson. He was under no requirement to work a given number of hours or days. He could take a vacation whenever he wished and for as long as he desired, with no notification to Olson. He was permitted, but not required, to attend sales meetings, but as a matter of fact he attended all such meetings. He could be called upon to service customers but was not required to respond. He was not required to make any reports as to where he was going or where he had been. Other Olson salesmen made daily reports, mailed in weekly, concerning their business activities. Morrill did have a mailbox with his name on it in the company office in Albert Lea, where he lived, and he would occasionally receive messages there from Olson or one Dale Pederson, a sales manager. Records of Morrill's sales, commissions, and other data were kept in the same manner as that of other salesmen.

Morrill was given an order book and a catalog by Olson. Anyone could obtain a catalog, which usually comes with a retail price list. The wholesale price could be figured from a code in the catalog. Morrill was also given sample products, which he either had to pay for or return if he did not sell them. He was given no stationery or business cards. While he gave gifts to his customers, such as pencil sets, he did so at his own expense.

Morrill furnished his own automobile. He owned two automobiles and two trailers. He generally used a Ford Ranchero to pull the trailers, which he frequently used to haul Olson products when he delivered them. He also used the trailers for other purposes. He carried his own automobile liability insurance. He was not reimbursed for any expenses, such as traveling expenses, meals, postage, and telephone calls.

At times Morrill sold small amounts of merchandise for other companies, but these other products were noncompetitive with Olson products and were sold with the consent of Olson. As to these products, he bought from the manufacturer and resold.

In 1953, Morrill had a written employment contract with Olson which expired by its own terms on December 31, 1953. No new written contract was entered into thereafter. The representative of the company who negotiated the first contract with Olson was no longer with the company and the management had changed in 1956. Nothing was done about confirming the 1953 written contract, and certain territory given to Morrill therein was later withdrawn. While Morrill testified that he assumed he was still employed under the original written contract and that the relationship between Morrill and Olson remained the same as under this contract, this was disputed by Olson, who claimed that they had power to terminate their relationship with Morrill at any time. Morrill was of the opinion that it would be necessary to have 2 weeks' notice to terminate the contract, as was provided for in the written contract.

With respect to Olson's business records, they show that Olson withheld state and Federal income taxes from Morrill's commission payments; that they deducted the employee's share of his social security tax; and that they included him as an employee on workmen's compensation forms filed with the state and on the insurer's audit of drivers. He was also included in unemployment compensation forms and for wages paid under F. I. C. A.

One other individual who operated much like Morrill was a man named Gay Olson. He lived in Albert Lea, had an Olson catalog and order books, and sold to people in the area. Olson filled these orders but did not list him on workmen's compensation or unemployment compensation forms or deduct withholding taxes or social security from his commissions.

At the time of the accident, Morrill was proceeding to the farm of a personal friend, one Egon Jensen. He kept the trailers, equipment, samples, and items he would deliver to customers at this farm. The farm was used as a sort of warehouse for him. At the time of the accident both trailers were empty. He had order blanks, catalogs, and "water bowls," an Olson product, in his car. He had not made a sale to Jensen in 10 or 15 years, and he had made no sales for Olson during the month of December. On the day of the accident he had no intention

of doing any selling for Olson but was on his way to check on the trailers and to see if the driveway was open. He testified that he was planning a pleasure trip to Texas and wanted to check his trailer and tires before leaving.

Olson contends that under these facts it appears as a matter of law either that Morrill was not an employee of Olson or that, if he was, he was not engaged in the scope of his employment at the time of the accident.

1. At the outset, it is apparent that two distinct questions are involved, the first being whether Morrill was an employee of Olson so as to render Olson liable for his tort under the doctrine of respondeat superior. A negative answer to that question would, of course, dispose of the case without more.

On this issue, we think the evidence is sufficient to sustain the jury's findings that an employer-employee relationship did exist. No single test is available for determining such relationship. The question has been a fruitful source of litigation over the years. We have had occasion from time to time to consider a wide variety of facts in seeking an answer to this problem. The facts are seldom the same. Whether we apply the right of control or any other test, it is evident that no single factor standing alone will suffice. It is necessary to examine the overall relationship between the parties to determine whether the necessary contacts exist between them to establish one relationship or the other. For the most part we have followed the tests suggested by Restatement, Agency (2d) §§ 2 and 220. They are partly set forth in Castner v. Christgau, 222 Minn. 61, 66, 24 N. W. (2d) 228, 231.[1] In Gill v.

---

[1]"(2) In determining whether one acting for another is a servant or an independent contractor, the following matters of fact, among others, are considered:

"(a) *the extent of control* which, by the agreement, the master may exercise over the *details* of the work;

"(b) whether or not the one employed is engaged in a *distinct* occupation or business;

"(c) the kind of occupation, with reference to whether, in the locality, the work is usually done under the direction of the employer or by a *specialist without supervision;*

Northwest Airlines, Inc. 228 Minn. 164, 36 N. W. (2d) 785, we again indicated our adherence to the Restatement tests.

In Seavey, Law of Agency, § 84C, we find the following:

"The right to control the physical movements of the employee is the most important single element in most of the situations."

Numerous Minnesota cases stress the importance of right to control as a factor in determining the employer-employee relationship. Thus, in St. Paul-Mercury Ind. Co. v. St. Joseph's Hospital, 212 Minn. 558, 561, 4 N. W. (2d) 637, 639, we find the statement:

"* * * If the principal cannot control and direct the alleged agent, then he is not his agent."

In Frankle v. Twedt, 234 Minn. 42, 47, 47 N. W. (2d) 482, 487, we said:

"* * * The determinative right of control is not merely over *what* is to be done, but primarily over *how* it is to be done. Basically, it is the distinction between a person who is subject to orders as to *how* he does his work and one who agrees only to do the work in his own way."

In Castner v. Christgau, 222 Minn. 61, 67, 24 N. W. (2d) 228, 231, we said:

"* * * if the will of the person for whom the services are performed controls merely as to the *result* to be obtained, but not as to the *means of obtaining such result,* the person doing the work does not come within the master-and-servant doctrine."

See, also, Nicholas v. Hennepin Wheel Goods Co. 239 Minn. 269, 58 N. W. (2d) 572.

---

"(d)    the *skill* required in the particular occupation;

"(e)    whether the employer or the workman supplies the *instrumentalities,* tools and the *place* of work for the person doing the work;

"(f)    the length of time for which the person is employed;

"(g)    the method of payment, whether by the time or by the job;

"(h)    whether or not the work is a part of the regular business of the employer; and

"(i)    whether or not the *parties believe* they are creating the relationship of master and servant."

We have frequently said that it is *right* to control, not the exercise of it, that is important. In Lindbery v. J. A. Danens & Son, Inc. 266 Minn. 420, 425, 123 N. W. (2d) 695, 698, we recently had occasion to examine this question and indicated that there might be merit also in the "nature of the work" test, but we did not feel compelled to adopt it as the test in that case.

Many of the cases involving this question relate to the application of the workmen's compensation law, and, while those laws are construed liberally in favor of an injured workman, the concept of the relationship is the same whether it be a workmen's compensation case or a tort action. In the Lindbery case we said (266 Minn. 424, 123 N. W. [2d] 698):

"* * * under a given set of facts we cannot justify inconsistent conclusions simply because a common-law action may be involved in one case and a workmen's compensation claim in another."

Defendant Olson relies heavily on Geerdes v. J. R. Watkins Co. 258 Minn. 254, 103 N. W. (2d) 641, but the facts in that case and those in the case now before us are clearly distinguishable. In the Geerdes case we held that a vendor-vendee relationship existed between Geerdes and the Watkins company. He purchased products from Watkins for later resale to his customers. He was in all respects an itinerant vendor. The only real difference between his operation and that of an ordinary storekeeper was that he had no fixed place of business. He purchased his goods and took them to his customers for resale instead of having them come to him, as is done in the case of a storekeeper.

Here, Morrill operated as a salesman, at least part of the time. It is true that he did purchase equipment from Olson for resale, but he also sold on commission, in which case he did not stock the goods sold, as was done in the Geerdes case. When he sold on a commission, Olson took the risk of credit advanced, and the commission was not paid unless Olson received payment. Even though he occupied a dual capacity in his various dealings with people to whom he sold, there is sufficient evidence to conclude that at least part of the time he was an employee of Olson. That a salesman selling on commission can be an employee can hardly be open to doubt.

It has been held that, where as here the company deducts social security payments, income taxes, premium on employee's group insurance, includes the individual in its workmen's compensation coverage, and includes him in the audit to determine the premium to be paid therefor, these facts constitute evidence of the fact that the individual is an employee rather than an independent contractor. See, Peetz v. Masek Auto Supply Co. Inc. 160 Neb. 410, 70 N. W. (2d) 482; Lawrence v. Vail (D. S. D.) 166 F. Supp. 777.

2. We come then to the question: Was Morrill engaged in the scope of his employment at the time of this accident? Here the findings of the jury hang on a more tenuous thread.

A broad general rule is stated in Seavey, Law of Agency, § 83, as follows:

"A master, although not liable because of his own conduct, is liable for the unauthorized tortious conduct of a servant which is within the scope of employment."

As a definition of scope of employment we find (Id. § 87):

"Conduct of a servant is within the scope of his employment if it is not a serious departure from authorized conduct in manner or space, is actuated in part by a motive to serve the master, * * *."

And at § 87B:

"* * * In every case, the intent by the servant to act for the employer is basic."

In Prosser, Torts (2 ed.) § 62, we find the following as the basis for vicarious liability:

"* * * the true basis of * * * vicarious liability is one of policy. As in other cases of strict liability, there is a deliberate allocation of a risk. The losses caused by torts of the servant which are more or less certain to occur in the conduct of the master's enterprise, and are closely connected with it, are placed upon the employer because he is better able to bear them, and to distribute them, through prices, rates or liability insurance, to the public."

As to scope of authority, we find (Id. § 63):

"* * * It has been said that in general the servant's conduct is within the scope of his employment if it is of the kind which he is authorized to perform, occurs substantially within the authorized limits of time and space, and is actuated, *at least in part,* by a desire to serve the master." (Italics supplied.)

See, also, Restatement, Agency (2d) § 228.

In Laurie v. Mueller, 248 Minn. 1, 4, 78 N. W. (2d) 434, 437, we find the following:

"* * * This doctrine of vicarious liability of the master rests upon the sound principle that, if an employer expects to derive certain advantages from the acts performed by others for him, he, as well as the careless employee, should bear the financial responsibility for injuries occurring to innocent third persons as a result of the negligent performance of such acts. But this responsibility is not carried to the point where an employer is absolutely liable for every tortious act of his employees, and there is incorporated within the doctrine a requirement that the servant's acts must be within the scope of his employment in order that the employer may be held liable. Because the term 'scope of employment' is impossible of concrete definition, its application must depend upon the circumstances of each individual case."

See, also, Morier v. St. Paul, M. & M. Ry. Co. 31 Minn. 351, 17 N. W. 952; Frankle v. Twedt, 234 Minn. 42, 47 N. W. (2d) 482.

In Loucks v. R. J. Reynolds Tobacco Co. 188 Minn. 182, 246 N. W. 893, where many of our cases are collected, we held that the employee was not engaged in the scope of his employment when the accident happened. We did say, however (188 Minn. 189, 246 N. W. 895):

"* * * An employe's service to the employer need not be the sole cause of the particular journey upon the highway, but it must be a concurrent cause. To establish liability the inference must be permissible that the trip would have been made though the errand had been canceled."

Ordinarily, where the question arises on disputed evidence, it is for the jury to resolve it.

Under these rules, can it be said that Morrill was engaged in the scope of his employment at the time he was involved in this accident? The evidence in support of such a finding might be summarized briefly as follows: He was proceeding to a friend's farm which he used at times as a sort of warehouse for Olson products; at this farm he kept his trailers, which he used mainly for the delivery of Olson products; in traveling to the farm on the day of the accident he had in his possession order blanks, a catalog, and a product manufactured by Olson; he was not on a personal visit but intended to ascertain whether the trailers were in shape so that they could be used if necessary and whether the road was open so that he could get the trailers out if he needed to. On the other side of the proposition, it appears that he was not intending to make any sale to Jensen; he had made no sale for Olson during the month of December; he used his trailers for purposes other than the delivery of Olson products; both trailers were empty at the time and he had no intention of doing any selling for Olson that day. It also appears that he was contemplating a pleasure trip to Texas. While these opposing facts surely present a borderline case, we believe that they do permit a jury to infer that he was acting within the scope of his employment, inasmuch as the trailers were used primarily for servicing Olson customers and delivering Olson products to them and that Morrill was going to the farm for the sole purpose of checking the trailers and the tires and the road so he would know that they were in shape if he needed to use the trailers.

Obviously, the jury could have found the other way, and if the case had been submitted to us as a factfinder we might even have come to the opposite conclusion, but on facts such as these a determination of this question ordinarily should be left to the jury. Shotts v. Standard Oil Co. 181 Minn. 386, 232 N. W. 712; Schultz v. Swift & Co. 210 Minn. 533, 299 N. W. 7. In both of those cases the employee was operating his employer's car, which presented a prima facie case that he was acting within the scope of his employment, but the mere fact that a salesman operated his own car, except for the variance in the burden of proof, would not prevent a finding that he was operating within the scope of his employment. Thus, taking the evidence in the light most

favorable to the verdict, we conclude that we cannot hold as a matter of law that Morrill was not acting within the scope of his employment at the time of this accident.

3. Errors alleged as grounds for a new trial relate first to the admissibility of the written contract entered into between Morrill and Olson Manufacturing Company on January 10, 1953, which by express terms expired on December 31, 1953. The question of admissibility first arose in the cross-examination of Morrill as follows:

"Q. I assume that Mr. Pederson or Mr. Olson could discharge you any time they wanted, couldn't they?

"A. Within two weeks.

"Q. Well, do you have some agreement that they give you two weeks' notice?

"A. Oh, I have a contract from the company from when I first started.

"Q. You had a contract when you first started?

"A. Before, yes, years ago. I got the same contract I have always had. That is when I first started.

"Q. You have a contract with them. Has it been renewed or—

"A. Same one, just went along.

"Q. Never been signed by this new management?

"A. No.

"Q. But you have been working under the arrangement that they must give you two weeks before they fire you?

"A. That is what the contract says.

"Mr. Robb: Is that contract in writing?

"The Witness: Yes, sir.

"Mr. Robb: Then that is objected to as calling for the content of a written instrument. If there is an answer, I move it be stricken.

"The Court: On what ground?

"Mr. Robb: On the ground that he is asking now for the contents of a written instrument.

"The Court: This is not the best evidence; that is the objection. Is that the objection, Counselor? Sustained."

Thereafter it was elicited from Morrill that he had in his possession the original contract entered into with the company, and it was produced. It was then reoffered and the objection to its admission was, essentially, that it was irrelevant. Both parties examined Morrill extensively as to the contents of the written contract and as to how Morrill operated after its expiration. He testified that he continued to operate in the same manner after the expiration of the contract as he had during its existence. It appeared that the management of the company had changed over the years and that some changes had been made in the territory assigned to Morrill, but aside from that he contended that he still continued to operate under the terms of the original written contract.

The written agreement spelled out in some detail the relationship between the two parties. Clearly, if Morrill had continued to operate under this written agreement it would be the strongest evidence of an employer-employee relationship. If, after the expiration of the written contract, the parties had continued to work as they did under it, it is also evidence of the terms of the employment.[2]

If they had chosen to do so, the parties could have adopted the prior written agreement as the agreement under which they would continue to operate. Zieve v. Holstad Coffee Co. 198 Minn. 580, 270 N. W. 581. Relevancy is largely a matter of logic. Among the definitions we find in Webster's Third New International Dictionary (1961) p. 1917, is the following:

"* * * affording evidence tending to prove or disprove the matters at issue or under discussion."

McCormick, Evidence, § 152, contains the following statement:

"* * * Relevancy in logic is the tendency of evidence to establish a proposition which it is offered to prove."

If the offered evidence permits an inference to be drawn that will justify a desired finding of fact, it is relevant. Reduced to simple terms, any

---

[2]As to an employee's rights with respect to compensation where he continues to work after expiration of a contract for a definite term, see Annotation, 53 A. L. R. (2d) 384.

evidence is relevant which logically tends to prove or disprove a material fact in issue. See, 36A Wd. & Phr. (Perm. ed.) p. 443; State v. Upson, 162 Minn. 9, 201 N. W. 913; 7 Dunnell, Dig. (3 ed.) § 3229.

With these definitions in mind, clearly the offered exhibit, taken with the testimony of Morrill, had probative value in establishing the relationship between the parties. There was no error in admitting it.

4. The only other claim of error is that plaintiff's counsel was guilty of such prejudicial misconduct in his final summation to the jury that there should be a new trial. The statements complained of are the following:

"* * * it is extremely important that Olson Manufacturing Company be held in this lawsuit, and * * * I think you will also recognize this, it was extremely difficult and frustrating for us as the plaintiffs to get this information and to find out the true facts here. I think you know what problems we labored under to try to get certain things into this case, the objections and the things that were kept from us. * * *

* * * * *

"* * * Finally on April 27th when we took the deposition, were you an employee of the Olson Manufacturing Company? Yes, sir, I thought I was then. Do you remember that running testimony? Maybe it is interesting for me to read it to you. And Charlie Morrill says, well, I thought I was. Well, you still think you are? Here it is, Mr. Robb. What were you on April 27th? Answer: I figured I was an employee. Question: Why? Well, I don't know. I just don't know the difference, I guess. Question: You just don't know the difference? Answer: I thought a salesman was an employee. * * *

* * * * *

"* * * There goes Charlie Morrill driving into a driveway and on the way, God forbid, he runs over a child. What was he going in the driveway for? He was going in to sell for Olson Manufacturing. And they say to you, that poor child's mother, we are sorry, Charlie is a peddler, we don't know him."

While these statements do go beyond the bounds of fairness, we do not believe that they are so prejudicial as to justify a new trial.

Whether to grant a new trial for improper remarks of counsel during the trial is largely within the discretion of the trial court. The primary consideration is prejudice. Boutang v. Twin City Motor Bus Co. 248 Minn. 240, 80 N. W. (2d) 30; Beebe v. Kleidon, 242 Minn. 521, 65 N. W. (2d) 614; Willmar Gas Co. v. Duininck, 239 Minn. 173, 58 N. W. (2d) 197.

While we do not condone the last statement quoted above, which obviously was intended only for the purpose of prejudicing the jury, we do not think it would be sufficient to affect the outcome of the case. Some misconduct is so prejudicial it cannot be overcome. Here, the trial court has passed upon the question and was of the opinion that these statements would not affect the outcome of the lawsuit. We have frequently held that the trial court is in a better position than we are to determine the prejudicial effect of such statements upon the jury. Jurgensen v. Schirmer Transp. Co. 242 Minn. 157, 64 N. W. (2d) 530; Wilson v. Sorge, 256 Minn. 125, 97 N. W. (2d) 477. While these statements approach the area where counsel may find it necessary to retry a case, we are of the opinion that they do not require a new trial.

While the case admittedly is a borderline case, we think it must be affirmed.

Affirmed.