EDGEWATER MOTELS, INC.,
Appellant-Respondent,

v.

A. J. GATZKE, Respondent-Appellant,

B & D Corporation, Inc., d.b.a. The
Bellows, Respondent,

Walgreen Company, Respondent.

Nos. 48328, 48347.

Supreme Court of Minnesota.

Jan. 26, 1979.

12

Hanft, Fride, O'Brien & Harries and Tyrone P. Bujold and Richard R. Burns, Duluth, for appellant-respondent.

Taylor Law Firm and Elmer W. Foster, Jr., Minneapolis, for Gatzke.

Clarance E. Hagglund, Minneapolis, Joel M. Muscoplat, Minneapolis, for B & D Corp., Inc.

Johnson, Fredin, Killen, Thibodeau & Seiler and John J. Killen, Jr., Duluth, for Walgreen Co.

Heard before ROGOSHESKE, PETER-SON, and SCOTT, JJ., and considered and decided by the court en banc.

SCOTT, Justice.

This matter consists of two consolidated appeals from the post-trial orders of the St. Louis County District Court. Plaintiff Edgewater Motels, Inc., and defendant A. J. Gatzke contend that the trial judge erred by ordering judgment for defendant Walgreen Company notwithstanding a jury verdict which found that Gatzke, a Walgreen employee, negligently caused a fire in plaintiff's motel while he was in the scope of his employment. Plaintiff also claims that the trial judge erred in refusing to set aside a jury finding that plaintiff's negligence caused 40 percent of the damages sustained by Edgewater. We reverse in part and affirm in part.

The fire in question broke out on August 24, 1973, in a room at the Edgewater Motel in Duluth, Minnesota, occupied by Arlen Gatzke. In July 1973, Gatzke, a 31-year Walgreen employee and then district manager, spent approximately three weeks in Duluth supervising the opening of a new Walgreen's restaurant. During that time, he stayed at the Edgewater Motel at Walgreen's expense. On about August 17, 1973, Gatzke returned to Duluth to supervise the opening of another Walgreen-owned restaurant. Again, he lived at the Edgewater at the company's expense. While in Duluth, Gatzke normally would arise at 6:00 a. m. and work at the restaurant from about 7:00 a. m. to 12:00 or 1:00 a. m. In addition to working at the restaurant, Gatzke remained on call 24 hours per day to handle problems arising in other Walgreen restaurants located in his district.

Gatzke thought of himself as a "24 hour a day man." He received calls from other Walgreen restaurants in his district when problems arose. He was allowed to call home at company expense. His laundry, living expenses, and entertainment were items of reimbursement. There were no constraints as to where he would perform his duties or at what time of day they would be performed.

On August 23, 1977, Gatzke worked on the restaurant premises for about seventeen hours. This was the seventh consecutive day that he put in such long hours. One of his responsibilities that day was to work with Curtis Hubbard, a Walgreen district manager from another territory who was in Duluth to observe a restaurant opening and learn the techniques employed. Gatzke's supervisor, B. J. Treet, a Walgreen's regional director, was also present.

Between 12:00 and 12:30 a. m., Gatzke, Hubbard, Treet, and a chef left the restaurant in a company-provided car. The chef was dropped off at his hotel, the Duluth Radisson, and the other three proceeded to the Edgewater, where they each had a room. Upon arrival at the Edgewater, Treet went to his room. Gatzke and Hubbard decided to walk across the street to the Bellows restaurant to have a drink.

In about an hour's time Gatzke consumed a total of four brandy Manhattans, three of which were "doubles." While at the Bellows, Gatzke and Hubbard spent part of the time discussing the operation of the newly-opened Walgreen restaurant. Additionally, Gatzke and the Bellows' bartender talked a little about the mixing and pricing of drinks. The testimony showed that Gatzke was interested in learning the bar business because the new Walgreen restaurant served liquor.

Between 1:15 and 1:30 a. m. Gatzke and Hubbard left the Bellows and walked back to the Edgewater. Witnesses testified that Gatzke acted normal and appeared sober. Gatzke went directly to his motel room, and then "probably" sat down at a desk to fill out his expense account because "that was [his] habit from travelling so much." The

completion of the expense account had to be done in accordance with detailed instructions, and if the form was not filled out properly it would be returned to the employee unpaid. It took Gatzke no more than five minutes to fill out the expense form.

While Gatzke completed the expense account he "probably" smoked a cigarette. The record indicates that Gatzke smoked about two packages of cigarettes per day. A maid testified that the ash trays in Gatzke's room would generally be full of cigarette butts and ashes when she cleaned the room. She also noticed at times that the plastic wastebasket next to the desk contained cigarette butts.

After filling out the expense account Gatzke went to bed, and soon thereafter a fire broke out. Gatzke escaped from the burning room, but the fire spread rapidly and caused extensive damage to the motel. The amount of damages was stipulated by the parties at $330,360.

One of plaintiff's expert witnesses, Dr. Ordean Anderson, a fire reconstruction specialist, testified that the fire started in, or next to, the plastic wastebasket located to the side of the desk in Gatzke's room. He also stated that the fire was caused by a burning cigarette or match. After the fire, the plastic wastebasket was a melted "blob." Dr. Anderson stated that X-ray examination of the remains of the basket disclosed the presence of cigarette filters and paper matches.

The jury found that Gatzke's negligence was a direct cause of 60 percent of the damages sustained by Edgewater. The jury also determined that Gatzke's negligent act occurred within the scope of his employment with Walgreen's. Plaintiff was found to be negligent (apparently for providing a plastic wastebasket) and such negligence was determined to be responsible for 40 percent of the fire damage sustained by Edgewater. The jury also decided that "The Bellows" was not liable.

Thereafter, Walgreen's moved for judgment notwithstanding the jury findings and, in the alternative, a new trial. Plaintiff moved to set aside the jury's findings that Edgewater was negligent and that such negligence was a direct cause of the fire. The district court granted Walgreen's motion for judgment notwithstanding the verdict, ruling that Gatzke's negligence did not occur within the scope of his employment, and denied all other motions.

The following issues are presented in this case:

(1) Did the trial court err in setting aside the jury finding that Gatzke's negligent conduct occurred in the scope of his employment?

(2) Did the trial court err in refusing to set aside the jury's findings that Edgewater was contributorily negligent and that such negligence was a direct cause of the damages sustained by Edgewater?

 1. The granting of a judgment notwithstanding a jury verdict is a pure question of law. *Ford v. Stevens,* 280 Minn. 16, 157 N.W.2d 510 (1968). In reviewing the trial court's decision we apply the same standard as the trial court did in passing upon the jury verdict. See, *Sikes v. Garrett,* Minn., 262 N.W.2d 681 (1977). The applicable standard was articulated by this court in *Cofran v. Swanman,* 225 Minn. 40, 42, 29 N.W.2d 448, 450 (1947), as follows:

"A motion for judgment non obstante accepts the view of the evidence most favorable to the verdict and admits every inference reasonably to be drawn from such evidence, as well as the credibility of the testimony for the adverse party, and if the application of this rule, in the light of the evidence as a whole, discloses a reasonable basis for the verdict, the motion must be denied. [Citations omitted.]

\* \* \* \* \* \*

"\* \* \* The power to set aside a verdict should be exercised sparingly. If, however, upon a search of the entire record, after taking the evidence in the light most favorable to the verdict and giving the adverse party the benefit of every inference reasonably deducible therefrom, the evidence as a whole manifestly and so

overwhelmingly preponderates to the contrary as to be practically conclusive against the verdict, the motion for judgment non obstante should be granted. * * * "

■ It is reasonably inferable from the evidence, and not challenged by Walgreen's or Gatzke on appeal, that Gatzke's negligent smoking of a cigarette was a direct cause of the damages sustained by Edgewater. The question raised here is whether the facts of this case reasonably support the imposition of vicarious liability on Walgreen's for the conceded negligent act of its employee.

■ It is well settled that for an employer to be held vicariously liable for an employee's negligent conduct the employee's wrongful act must be committed within the scope of his employment. *Seidl v. Trollhaugen, Inc.,* 305 Minn. 506, 232 N.W.2d 236 (1975); *Nelson v. Nelson,* 282 Minn. 487, 166 N.W.2d 70 (1969). As this court stated in *Laurie v. Mueller,* 248 Minn. 1, 4, 78 N.W.2d 434, 437 (1956):

"* * * This doctrine of vicarious liability of the master rests upon the sound principle that, if an employer expects to derive certain advantages from the acts performed by others for him, he, as well as the careless employee, should bear the financial responsibility for injuries occurring to innocent third persons as a result of the negligent performance of such acts. But this responsibility is not carried to the point where an employer is absolutely liable for every tortious act of his employees, and there is incorporated within the doctrine a requirement that the servant's acts must be within the scope of his employment in order that the employer may be held liable. * * *."
(Footnotes omitted.)

■ To support a finding that an employee's negligent act occurred within his scope of employment, it must be shown that his conduct was, to some degree, in furtherance of the interests of his employer. *Lange v. National Biscuit Co.,* 297 Minn. 399, 211 N.W.2d 783 (1973); *Laurie v. Mueller, supra.* This principle is recognized by Restatement, Agency 2d, § 235,[1] which states:

"An act of a servant is not within the scope of employment if it is done with no intention to perform it as a part of or incident to a service on account of which he is employed."

Other factors to be considered in the scope of employment determination are whether the conduct is of the kind that the employee is authorized to perform and whether the act occurs substantially within authorized time and space restrictions. *Boland v. Morrill,* 270 Minn. 86, 132 N.W.2d 711 (1965); Restatement, Agency 2d, § 228. No hard and fast rule can be applied to resolve the "scope of employment" inquiry. Rather, each case must be decided on its own individual facts. *Seidl v. Trollhaugen, Inc., supra; Laurie v. Mueller, supra.*

The initial question raised by the instant factual situation is whether an employee's smoking of a cigarette can constitute conduct within his scope of employment.[2] This issue has not been dealt with by this court. The courts which have considered the question have not agreed on its resolution. See, Annot., 20 A.L.R.3d 893 (1968). A number of courts which have dealt with the instant issue have ruled that the act of smoking, even when done simultaneously with work-related activity, is not within the employee's scope of employment because it is a matter personal to the employee which is not done in furtherance of the employer's interests.[3] See, e. g., *Herr v. Simplex Pa-*

1. Restatement, Agency 2d, § 235, is cited with approval in *Gackstetter v. Dart Transit Co.,* 269 Minn. 146, 150, n. 4, 130 N.W.2d 326, 329, n. 4 (1964), and *Laurie v. Mueller,* 248 Minn. 1, 5, n. 5, 78 N.W.2d 434, 437, n. 5 (1956).

2. The district court did not address this issue, and thus apparently assumed that an employer could be held vicariously liable for an employ-

ee's negligent smoking, if done concurrently with an activity which is otherwise within the employee's scope of employment.

3. We also note that Restatement, Agency (2d), supports the position that, in a situation similar to the instant case, the negligent smoking of a cigarette is outside an employee's scope of employment. Compare Restatement, Agency

per Box Corp., 330 Pa. 129, 198 A. 309 (1938); *Tomlinson v. Sharpe,* 226 N.C. 177, 37 S.E.2d 498 (1946); *Kelly v. Louisiana Oil Refining Co.,* 167 Tenn. 101, 66 S.W.2d 997 (1934); *Dobson v. Don January Roofing Co.,* 392 S.W.2d 153, 20 A.L.R.3d 887 (Tex.Civ. App.), writ of error refused, 394 S.W.2d 790 (Tex.1965).

Other courts which have considered the question have reasoned that the smoking of a cigarette, if done while engaged in the business of the employer, is within an employee's scope of employment because it is a minor deviation from the employee's work-related activities, and thus merely an act done incidental to general employment. See, e. g., *Wood v. Saunders,* 228 App.Div. 69, 238 N.Y.S. 571 (1930); *Vincennes Steel Corp. v. Gibson,* 194 Ark. 58, 106 S.W.2d 173 (1937); cf., *De Mirjian v. Ideal Heating Corp.,* 129 Cal.App.2d 758, 278 P.2d 114 (1955) (employee's negligent filling of cigarette lighter with fluid found to be within the scope of his employment).

For example, in *Wood v. Saunders, supra,* a gas station attendant negligently threw his lighted cigarette across an automobile's fuel tank opening while he was filling the vehicle with gasoline. The court, in finding this act to be within the employee's scope of employment, stated:

"In the case at bar, there was no abandonment by the employee of the master's purposes and business while the employee was smoking and carrying the lighted cigarette. There was merely a combining by the employee, with the carrying out of the master's purposes, of an incidental and contemporaneous carrying out of the employee's private purposes. \* \* \*" 228 App.Div. 72, 238 N.Y.S. 574.

 The question of whether smoking can be within an employee's scope of employment is a close one, but after careful consideration of the issue we are persuaded by the reasoning of the courts which hold that smoking can be an act within an employee's scope of employment. It seems only logical to conclude that an employee

does not abandon his employment as a matter of law while temporarily acting for his personal comfort when such activities involve only slight deviations from work that are reasonable under , the circumstances, such as eating, drinking, or smoking. As was stated by the court in *De Mirjian v. Ideal Heating Corp., supra:*

"A mere deviation by an employee from the strict course of his duty does not release his employer from liability. An employee does not cease to be acting within the course of his employment because of an incidental personal act, or by slight deflections for a personal or private purpose, if his main purpose is still to carry on the business of his employer. Such deviations which do not amount to a turning aside completely from the employer's business, so as to be inconsistent with its pursuit, are often reasonably expected and the employer's assent may be fairly assumed. In many instances they are the mingling of a personal purpose with the pursuit of the employer's business. In order to release an employer from liability, the deviation must be so material or substantial as to amount to an entire departure. \* \* \*" 129 Cal. App.2d 765, 278 P.2d 118 (citation omitted).

We agree with this analysis and hereby hold that an employer can be held vicariously liable for his employee's negligent smoking of a cigarette he was otherwise acting in the scope of his employment at the time of the negligent act.

 Thus, we must next determine whether Gatzke was otherwise in the scope of his employment at the time of his negligent act. In setting aside the jury's scope of employment determination, the trial court stated that:

" \* \* \* it is difficult to discount the effect of four drinks—three of which were 'double'—taken within the period of about 30 minutes. Had Gatzke gone immediately to his room, as did his supervisor, and then filled out his expense

(2d), § 235, comment d, *illustration* 5 and *illustration* 6; see, also, *Minamayor Corp. v. Paper*

*Mill Suppliers, Inc.,* 297 F.Supp. 524, 526 (E.D. Pa.1969).

account, there might be some validity to his claim that he was within the scope of his employment."

It appears that the district court felt that Gatzke was outside the scope of his employment while he was at the Bellows, and thus was similarly outside his scope of employment when he returned to his room to fill out his expense account. The record, however, contains a reasonable basis from which a jury could find that Gatzke was involved in serving his employer's interests at the time he was at the bar. Gatzke testified that, while at the Bellows, he discussed the operation of the newly-opened Walgreen's restaurant with Hubbard. Also, the bartender stated that on that night "[a] few times we [Gatzke and the bartender] would talk about his business and my business, how to make drinks, prices."

But more importantly, even assuming that Gatzke was outside the scope of his employment while he was at the bar, there is evidence from which a jury could reasonably find that Gatzke resumed his employment activities after he returned to his motel room and filled out his expense account.[4] The expense account was, of course, completed so that Gatzke could be reimbursed by Walgreen's for his work-related expenses. In this sense, Gatzke is performing an act for his own personal benefit. However, the completion of the expense account also furthers the employer's business in that it provides detailed documentation of business expenses so that they are properly deductible for tax purposes.[5] See, 26 U.S.C.A. § 274 (1978). In this light, the filling out of the expense form can be viewed as serving a dual purpose; that of furthering Gatzke's personal interests and promoting his employer's business purposes.[6] Accordingly, it is reasona-

ble for the jury to find that the completion of the expense account is an act done in furtherance of the employer's business purposes.

Additionally, the record indicates that Gatzke was an executive type of employee who had no set working hours. He considered himself a 24-hour-a-day man; his room at the Edgewater Motel was his "office away from home." It was therefore also reasonable for the jury to determine that the filling out of his expense account was done within authorized time and space limits of his employment.

In light of the above, we hold that it was reasonable for the jury to find that Gatzke was acting within the scope of his employment when he completed his expense account. Accordingly, we set aside the trial court's grant of judgment for Walgreen's and reinstate the jury's determination that Gatzke was working within the scope of his employment at the time of his negligent act.

■■■■ 2. Edgewater contends that the jury's findings relating to Edgewater's contributory negligence are not reasonably supported by the record. It first claims that it owed no duty to protect against its guests' negligence. This court, in *Jacobs v. Draper,* 274 Minn. 110, 142 N.W.2d 628 (1966), stated that: " * * * there are many situations in which a reasonable man is expected to anticipate and guard against the conduct of others." 274 Minn. 116, 142 N.W.2d 633. In that case we quoted from Prosser, Torts (3 ed.), § 33 at 173, as follows, in part:

" * * * In general, where the risk is relatively slight, he is free to proceed upon the assumption that other people will exercise proper care. * * * But when the risk becomes a serious one, ei-

---

**4.** *It is well settled that a temporary departure from an employee's scope of employment will suspend an employer's vicarious liability only until the deviation has ended. Nelson v. Nelson,* 282 Minn. 487, 166 N.W.2d 70 (1969).

**5.** Although this fact was not brought out at trial, it is a matter within the jury's common knowledge.

**6.** *To be within the scope of employment the act need only be motivated in part to further the interests of the employer. Laurie v. Mueller, supra;* Restatement, Agency (2d), §§ 228, 236.

ther because the threatened harm is great, or because there is an especial likelihood that it will occur, reasonable care may demand precautions against 'that occasional negligence which is one of the ordinary incidents of human life and therefore to be anticipated.' 'It is not due care to depend upon the exercise of care by another when such reliance is accompanied by obvious danger.' * * * " 274 Minn. 116, 142 N.W.2d 633.

The record indicates that Edgewater had notice of its guests' practice of placing cigarette materials in their motel rooms' plastic wastebaskets. The Edgewater maid who regularly cleaned the room in which Gatzke was staying testified that she had seen cigarette butts in the wastebasket in Gatzke's room. She also stated that, in her experience, she had observed that many other motel residents would often "dump" ash trays and cigarettes in their motel rooms' plastic wastebaskets. She further testified that the head housekeeper had knowledge of the motel guests' habit of leaving cigarette butts in these plastic baskets. In light of these facts, and consistent with the principle articulated in *Jacobs v. Draper, supra,* it was reasonable for the jury to find that Edgewater had a duty to protect against the dangers which might flow from its guests' disposal of smoking materials in the motel rooms' wastebaskets.

Edgewater further contends that defendants failed to prove that the use of a plastic wastebasket in and of itself can amount to a breach of a duty of due care. Again, however, the record does not support this contention. Edgewater's own expert witness, Dr. Anderson, testified that the plastic material out of which the wastebasket was made "burns readily." In fact, he had no difficulty igniting the remains of the wastebasket with a common household match. Based on this alone, the jury could quite reasonably conclude that a motel owner, aware that smoking materials were often dumped into wastebaskets, breached a duty of due care by providing a highly combustible plastic wastebasket.

It is also argued by Edgewater that its use of plastic wastebaskets was not negligent because "the use of such wastebaskets is commonplace." Of course, there is no merit to this contention as it is basic hornbook law that "[e]ven an entire industry, by adopting such careless methods to save time, effort or money, cannot be permitted to set its own uncontrolled standard." Prosser, Torts (4 ed.), § 33 at 167. Edgewater's conduct must be compared to that of the reasonably prudent motel owner, not that of a similarly negligent one.

Edgewater finally claims that, even if its use of a plastic wastebasket was negligent, such negligence was not a proximate cause of the fire damage. This contention is premised on the theory that the evidence does not show that the fire originated in the wastebasket. Plaintiff's expert, Dr. Anderson, in reference to the origin of the fire, testified on direct examination as follows:

" * * *

"Q Where, in your opinion, with reference to the wastebasket, did the fire originate, Doctor?

"A Basically in the wastebasket.

* * * * * *

"Q All right, Sir. Now, is that—Can you tell us whether that opinion that the fire originated in the wastebasket, is that consistent with all of the pointers and all of the char and all of the burn that you saw in that area, or is it not?

"A Yes, it is consistent. * * * "

[Following the noon recess the questioning continued as follows:]

"Q Doctor Anderson, at the noon break I was talking to you about the place of origin of the fire and I think—tell us, again, where did you say you felt that it originated?

"A I felt—it's my opinion that it originated right in the wastebasket or right next to it where I put the 'X' on the figure.

"A Well, that's what I wanted to ask you about. The 'X' that appears on Plaintiff's Exhibit Z does not appear

to be directly in the wastebasket and I wonder if that's an accident or whether you intended that?

"A No, that's where I think it started.

"Q Well, that's what I want to understand. You mean in the wastebasket or outside of the wastebasket?

"A Right next to it.

"Q So it could have been either one place or the other?

"A Yes."

The above testimony, coupled with the reasonable inferences which may be drawn from the facts of this case. (i. e., a person would presumably dispose of a cigarette in a wastebasket, rather than next to it), provides a reasonable basis from which the jury finding of proximate cause is supported.

The trial court's granting of judgment to Walgreen is hereby set aside, and the jury's verdict is hereby reinstated in its entirety.

Reversed in part; affirmed in part.

OTIS, J., took no part in the consideration or decision of this case.